**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CHRISTIE HARR, | ) | 2:21cv01560 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WASHINGTON AREA HUMANE SOCIETY, | ) | |
| MARANDA COOMBS (JOHN DOE 1), | ) | |
| BARB LYLE (JOHN DOE 2), CHELSEI | ) | |
| FLEEGA (JOHN DOE 3),   ESTATE | ) | |
| OF GLEN L. THOMSON,   KELLY PROUDFIT, | ) | |
| JOHN DOES 4-10 agents and employees | ) | |
| of the Washington Area Humane Society, | ) | |
| HUMANE SOCIETY OF THE UNITED | ) | |
| STATES, SHALIMAR OLIVER, | ) | |
| LEANA STORMONT, LAURA KOIVULA, | ) | |
| JOHN DOES 11-20 agents and | ) | |
| employees of the Humane Society of the | ) | |
| United States, HUMANE ANIMAL RESCUE, | ) | |
| JOHN DOES 21-30 agents and employees of | ) | |
| the Humane Animal Rescue, | ) | |
| KEN JERICHO, STEVEN TOPRANI, | ) | |
| MARVIN DAVIS, SAMUEL JENESKY | ) | |
| STATE TROOPER TIEGARDEN, | ) | |
| JOHN DOES 32-50 unknown law enforcement | ) | |
| Officers, | ) | |
| | ) | |
| Defendants. | ) | **JURY TRIAL DEMANDED** |

**CORRECTED[1]AMENDED COMPLAINT**

Christie Harr ("Harr") for her Amended Complaint, states:

1.   Plaintiff is Christie Harr, an individual.

2.  Defendant Washington Area Humane Society, who caused its agents to be

registered in Washington County, but not Westmoreland County, to act as

humane police officers pursuant to 22 P.S. 3708 and other statutes.

---

[1] This document corrects typographical errors in the Amended Complaint and constitutes an Errata.  It does not change the Amended Complaint.

3. Defendant Kelly Proudfit is an agent and employee of the Washington Area Humane Society, she is sued in her individual capacity.

4. Defendants Maranda Coombs (John Doe 1), Barb Lyle (John Doe 2), and Chelsei Fleega (John Doe 3) are agents and/or employees of the Washington Area Humane Society sued in their individual capacity.

5. The Estate of Glen L. Thomson is the successor in interest to Glen L. Thomson, a humane police officer registered in Washington County, but not Westmoreland County.  He was an agent and employee of WAHS.

6. Defendants John Does 2 through 10 are agents and employees of the Washington Area Humane Society who have not yet been identified, but could be through discovery.

7. Collectively the WAHS, Kelly Proudfit, Maranda Coombs, Barb Lyle, Chelsea Fleega, Glen Thomson/Estate of Glen Thomson, and Does 4 through 10 are referred herein as the "WAHS Defendants."

8. Defendant Humane Society of the United States is an organization not registered anywhere in Pennsylvania to act as humane police officers pursuant to 22 P.S. 3708 and other statutes, but conducted actions as if they were humane police officers.

9. Defendants Leana Stormont, Laura Koivula and Shalimar Oliver are agents and employees of the Humane Society of the United States.

10. Defendants John Does 11 through 20 are agents and employees of the Humane Society of the United States who have not yet been identified, but could be identified through discovery.

11. Collectively the HSUS, Leana Stormont, Laura Koivula, Shalimar Oliver, and Does 11 through 20 are collectively referred to as the HSUS Defendants.

12. Defendant Humane Animal Rescue (HAR) is an organization not registered in Westmoreland County to act as humane police officers pursuant to 22 P.S. 3708, but conducted actions as if they were humane police officers.

13. Defendants 21 through 30 are agents and employees of the Humane Animal Rescue who have not yet been identified, but could be identified through discovery.

14. Collectively HAR and Does 21 through 30 are hereby referred to as the "HAR Defendants."

15. Samuel Jenesky is a Pennsylvania State Trooper being sued for damages in his individual capacity and for declaratory and injunctive relief in his official capacity.

16. State Trooper Tiegarden, sued in the original Complaint as John Doe 31, is sued in her individual capacity for damages and in her individual and official capacity for declaratory and injunctive relief.

17. Ken Jericho is an ordinance officer for Donora, Pennsylvania. Jericho is being sued for damages in his individual capacity and for declaratory and injunctive relief in his official capacity.

18. Steven Toprani is the Solicitor for Donora, Pennsylvania, sued for damages in his individual capacity and for declaratory and injunctive relief in his official capacity.

19. Marvin Davis is a former Monessen, Pennsylvania, ordinance officer sued in his individual capacity for damages.

20. John Does 32 through 50 are unknown law enforcement officers sued in their individual capacity for damages and in their individual and official capacities for injunctive and declaratory relief.

**Jurisdiction**

21. Jurisdiction is conferred upon this Court pursuant to 28 USC 1331, 1337 ad 42 USC 1983.  Supplemental jurisdiction over the state claims exists pursuant 28 USC 1367.

**Pennsylvania's Statutory Scheme Allowing for Private Humane Police Officers**

22. Pennsylvania created a statute allowing employees of animal rights organizations to apply for certification and become "humane police officers after just a two week course." Humane Police Officers may only operate in counties where they are certified. 22 P.S. 3708(a).

23. The individual "has no power or authority to exercise the powers… in any other county whose court of common pleas has not issued an appointment." *Id.*

24.  For a judge to issue a search warrant for a humane police officer, said warrant must be approved by the district attorney. 22 P.S. 3710.

25.  Any rendering of a search warrant, or law enforcement activity, in violation of the statutory scheme constitutes a misdemeanor. 22 P.S. 3709.

**Westmoreland Criminal Proceedings Terminated Without Adjudication**

26. Various criminal proceedings against Harr were brought by Private Criminal Complaint filed by Defendant Washington Area Humane Society and Glen L. Thomson, including literally thousands of charges occurring in Washington and

Westmoreland counties.  The charges, regardless of where they occurred, were brought in Washington County.

27. Of course, neither the Washington Area Humane Society nor Glen L. Thomson maintained any authority to conduct any criminal investigation or police type activities in Westmoreland County.

28. When the charges were transferred to the Washington County Court of Common Pleas from the Magisterial District Justice, the Washington County District Attorney took over the case.

29. The charges were consolidated into allegations that the District Attorney averred occurred in Washington County alone and some charges that the District Attorney alleged occurred in Washington County "and other locations."

30. Ultimately, after negotiations where Harr repeatedly advised that she, under no circumstances, would enter any plea to any charges relating to alleged Westmoreland County conduct, the District Attorney agreed to allow Harr to enter a no contest plea knowing full well that the only matters Harr would resolve were Washington County conduct.

31. On September 9, 2022, a plea hearing occurred as to the Harr criminal case.

32. The Commonwealth amended the Information verbally to *neglect of animals*, 18 Pa.C.S. 5532(a)(1), a third degree misdemeanor in docket number 205-2020.

33. The Commonwealth amended the Information verbally to *neglect of animals*, 18 Pa.C.S. 5532(a)(1) on case 1186-2020.

34. The Commonwealth proffered no factual information as to this plea, did not describe any offense, and provided no background on the alleged conduct that Plaintiff was entering a no contest plea to.

35. When asked if Harr agreed, her counsel made it clear, "This is, Your Honor, the no contest to the <u>Washington County</u> charges, thank you very much."

36. At this point, a side bar took place off the record because the presiding Judge knew there existed a dispute about the Westmoreland County charges.

37. At this side bar, it was reiterated that Plaintiff was only entering a plea to Washington County charges and the Westmoreland County conduct abandoned.

38. A plea colloquy occurred, but at no time did the Court or any party discuss any factual basis for the plea.

39. Thereafter, Harr made a statement to the Court.  She made that she was entering a plea relating to Washington County conduct only.  She stated:

> I'm pleading No Contest or Nolo Contendre to two counts of misdemeanor level 3 animal neglect, regarding the charges in *Washington County*, for the conditions cited at *320 Second Street, Donora, Pennsylvania 15033, Washington County.*
>
> To be clear, I am not admitting guilt of any crime, but rather, if this case went to trial, they could possibly convince a jury that the animals in question were neglected.  At no point did I ever harm or intend to harm any of the animals in my case.  However, due to the damage both to the residence and the rescue by tornado in August of 2016, and the inability to raise the necessary funds for the repairs, the condition of the property was less than favorable.  I do want it noted that I was in the middle of moving the animals to a new, safe location, and had 75 percent of them already moved, when the search and seizure occurred.  So I was, indeed, doing my very best to remedy this situation.

And I would also just like to note that I was told that all my property would be returned' however, we have yet to receive an itemized statement for the items taken from the church.

40. Based on that statement, the Court accepted the plea and the hearing concluded.

41. Clearly, no adjudication occurred as to Westmoreland County conduct or charges stemming from any activity in Westmoreland County.

42. All remaining charges, other than Washington County specific, were withdrawn.

43. There was no ability to appeal any determination, pretrial order, or preliminary finding from the Court of Common Pleas as to the jurisdiction of the private animal rights officers who unlawfully operated in Westmoreland County as the charges were not pursued by the Commonwealth and were withdrawn and abandoned.

44. There was no final adjudication on the merits of the Westmoreland County events, allegations, or charges.

**The Unlawful Westmoreland County Investigation, Search, and Prosecution**

45. The Washington Area Humane Society operates a private law enforcement agency where its agents act as Humane Police Officers.

46. Agents of WAHS including Maranda Coombs, Glen Thomson, and Kelly Proudfit all participated in conducting the Westmoreland County investigation and law enforcement functions without being registered or authorized to act as Humane Police Officers in Westmoreland County.

47. The Humane Society of the United States, and its agents, despite routinely performing investigations and acting as Humane Police Officers throughout the

Commonwealth of Pennsylvania, refuse to register or comply with Pennsylvania's statutory scheme.

48. Plaintiff operated a non-profit animal shelter in Washington County. A tornado caused damage to the shelter. Plaintiff was in the process of moving the shelter to Westmoreland County when agents of the WAHS, a competing shelter, under the guise of desiring to assist Harr, offered to provide help when, in reality, they were conducting a surreptitious investigation.

49. During the course of the discussions with WAHS, including Glen Thomson and Kelly Proudfit, the Westmoreland County location was shown by Harr.

50. Unbeknownst to Harr, Thomson and WAHS had no authority to operate, investigate, or represent themselves to be Humane Police Officers in Westmoreland County.

51. Eventually, WAHS, its agents including Thomson, Coombs, and Proudfit, and the HSUS, including Shalimar Oliver, and the various Doe defendants, decided to continue their investigation and law enforcement functions by entering the Westmoreland property and seize the animals in question along with the property belonging to Harr without regard to their having the ability to operate in Westmoreland County.

52. According to HSUS' Oliver, she "was contacted" by WAHS, Proudfit, and Thomson towards the end of August 2019.

53. Pursuant to that contact, the "request was made to [HSUS] that should this be something that resulted in the execution of a search warrant, if our organization would be able to assist in supporting them with that seizure."

54. According to Oliver, the two search warrants, including the Westmoreland County warrant, involved a plan and confederation by the WAHS defendants and the HSUS defendants, "there was immense planning."

55. Based on information, despite having no law enforcement authority in Westmoreland County, both the WAHS defendants and the HSUS defendants controlled the creation, authoring, scheduling, presentation, and submission of the warrants.

56. According to Oliver, HSUS has "an office of general counsel that is comprised of several attorneys that have to determine, legally, how what we would engage in. And they also assist with the development of the MOUS, which is an agreement, a memorandum of understanding, to identify what the need is from the requesting agency, and what we're committing to providing to them, and for how long."

57. The WAHS defendants and the HSUS defendants entered into a comprehensive Memorandum of Understanding to jointly participate, confederate, and act in both the Washington County and the Westmoreland County investigations.  To date, neither the WAHS nor the HSUS have provided the Memorandum of Understanding.

58. Based on information from Coombs, "[WAHS] Executive Director Kelly Proudfit and [HSUS] Shalimar Oliver were in direct contact for quite a long time, setting things up for the seizure and investigation."

59. Based on information from Coombs, "the relationship with HSUS was started before the warrant was issued. There were meetings between us and the DA's office, and other representatives, to try to coordinate this large effort."

60. In October 2019, the WAHS defendants, HSUS defendants, Thomson, Proudfit, Coombs, Oliver, and others consulted and wrote a search warrant application for Thomson to sign and execute in Westmoreland County.

61. WAHS defendants, HSUS defendants, Thomson, Proudfit, Coombs, Oliver and others represented on said warrant application that Thomson was a statewide Humane Police Officer when, in reality, Thomson was not a statewide Humane Police Officer, but only authorized to act as a Humane Police Officer in Washington County.

62. WAHS defendants, HSUS defendants, Thomson, Proudfit, Coombs, Oliver, John Does, and others knew, recklessly disregarded, or should have known that Thomson had no authorization to act in Westmoreland County and that purporting to be a Humane Police Officer in that county constituted a crime.

63. In addition, WAHS defendants, HSUS defendants, Thomson, Proudfit, Coombs, Oliver, John Does, and others knew, recklessly disregarded, and ignored the requirement that, even if they were authorized to operate in Westmoreland County, they needed to obtain permission from the District Attorney to obtain a warrant.

64. To attempt and evade the prohibition on unregistered animal activists acting as Humane Police Officers, and the need for district attorney approval on the warrant, the WAHS defendants, HSUS defendants, Thomson, Proudfit, Coombs,

Oliver, John Does, and others arranged for State Police Trooper Tiegarden to initial the warrant.

65. Tiegarden had no knowledge of the facts in the warrant, could not attest to the facts, and made no assertion therein that the WAHS and Thomson were credible witnesses.

66. Moreover, Tiegarden knew, or should have known, that neither the WAHS nor Thomson had authority in Westmoreland County and that, even if they did have authority, needed approval of the District Attorney.

67. Tiegarden's name was nowhere on the warrant application as affiant except for the scribbled signature.

68. Tiegarden was not mentioned in the body of the search warrant.

69. The search warrant was not approved by the Westmoreland County District Attorney and the filing of the warrant and contents thereof by unregistered and illegal Humane Police Officers was withheld from the Westmoreland County District Attorney.

70. Based on the false representations by WAHS defendants, HSUS defendants, Thomson, Proudfit, Coombs, Oliver, John Does, Tiegarden, and others that WAHS and Thomson maintained authority to operate as Humane Police Officers in Westmoreland County or were statewide Humane Police Officers, a magisterial district judge approved a search warrant for Plaintiff's location in Westmoreland County.

71. On or about October 30, 2019, WAHS defendants, HSUS defendants, Thomson, Proudfit, Coombs, Oliver, John Does and others solicited various police agencies

to back them up and participate in the search, including the initial breach of the door.

72. Despite having no authority to operate as Humane Police Officers in Westmoreland County, agents of WAHS and HSUS entered Plaintiff's location.

73. The agents of WAHS and HSUS were allowed to enter by State Police Officer Tiegarden, who allowed them to enter then left the scene.

74. According to information from Coombs, she "personally, did not go into that property. When the HSUS, they took over the scene, as far as making sure that everything was documented and handled precisely, with their expertise.  So I was staged outside, helping with other HSUS volunteers, building cages, just kind of observing the situation and that kind of thing.  We did have two representatives from the Humane Society, two of our vet techs, that were in the actual house at the Monessen residence, and that was Barb Lyle and Chelsei Fleegal."

75. The WAHS, Coombs, and Thomson, despite having no authority to operate in Westmoreland County, arrested and transported Plaintiff to a district justice based on a cat in the Westmoreland (Monessen) property.

76. Specifically, according to Coombs, "I was at that property for probably about an hour, and then I was called to the Donora property, because they had served a felony warrant for the care of Linus the cat, that was found at the Monessen property.   And so me and Officer Glen Thomson met at the Donora property, went down to the Donora police station, and took Christie Harr to the magistrate to be arraigned on those charges."

77. Coombs and the WAHS moreless left HSUS in charge of the Monessen property, including allowing HSUS agents to remain inside Plaintiff's location despite none of their agents having any authority to act as Humane Police Officers in Pennsylvania or Westmoreland County.

78. According to HSUS' Oliver, agents of HSUS spent, "On site, physically, each location, cleaning and debriefing prior to those, I believe we were there  from about 7:00 a.m. to close to 8:00 p.m. at night, so if you consider about 12 to 13 hours physically in both of those locations."  One of the locations was the Westmoreland County location.

79. Based on information, Oliver herself entered the Westmoreland County property.

80. Based on information, HSUS' Koivula entered the property, assisted with the search, and seized items or assisted in the seizing of items from the Westmoreland County property.

81. Oliver explained that prior to the warrant execution, the HSUS uses "somebody who's going to provide the photography and mapping of the buildings and the structures that we're entering.  So that we can get that initial inspection and idea of exactly the magnitude we're dealing with."

82. Oliver explained that the HSUS allows law enforcement to secure the scene and make the first entrance.

83. Once that occurs, according to Oliver, law enforcement "will report back to the lead agency.   In this case, Washington Area Humane Society, identify what they have or have not found, any concerns that they may have had through their initial inspection as well."

84. After which, according to Oliver, "And from there is when we then took over with them and entered each structure," including the Westmoreland County structure.

85. HSUS' Oliver went to the property in Westmoreland County, entered it, and took photographs.

86. HSUS defendants, WAHS defendants, and HAR defendants took video of their actions, the Plaintiff's property, invited the news media, and made fundraising videos, including both the Washington County property and the Westmoreland County property.

87.    Based on information, the John Doe agents of Humane Animal Rescue were at the scene in Westmoreland County and entered Plaintiff's location and assisted with the search despite not being authorized to act as Humane Police Officers in Westmoreland County.

88. The HSUS and WAHS agents, including WAHS Thomson and HSUS Kaivula, found and seized various medical supplies that had no bearing to the case. These supplies included tubes, syringes, needles, IV lines, gauze, cotton, antibiotics, and antifungal sprays.

89. In addition, HSUS and WAHS agents took a memory card near Plaintiff's camera system and retained it.

90. Without verifying that HSUS and WAHS had any authority to search for items in the house, and without verifying whether they were registered, State Trooper Jenesky listed the items seized by HSUS and WAHS on a search warrant return and inventory.

91. The inventory stated that WAHS' Thomson, who was not registered in Westmoreland County as a Humane Police Officer, conducted the search and that he was "Badge 477" notwithstanding his lack of registration.

92. Jenesky then signed the inventory.

93.  Instead of taking possession of the items on the inventory, or securing them as evidence, they were simply gave them to HSUS and WAHS to take.

94. As to the memory card, it is unclear whether Thomson and Kaivula informed Jenesky of the seizure and it was omitted from the form, or whether HSUS and WAHS' seizure of the memory card was not revealed to Jenesky.

95. Nevertheless, Jenesky, Thomson, and Kaivula signed the search warrant inventory with Jenesky being the affiant,  Kaivula being the witness, and Thomson being the "person making search."

96. Jenesky allowed Thomson to sign the inventory as "Badge 477" despite Thomson and the WAHS having no badge number in Westmoreland County and no authority to operate.

97. Thereafter, the WAHS and Thomson initiated criminal proceedings based on the Westmoreland County investigation and seizure.

98. WAHS and Thomson utilized a private criminal complaint to initiate the prosecution as to the Westmoreland County matters.

99. While filed in Washington County, WAHS and Thomson included hundreds of allegations that took place exclusively in Westmoreland County.

100.    In 2020, realizing that they committed egregious violations of Pennsylvania law, and had no authorization to act in Westmoreland County, the WAHS

defendants and the HSUS defendants engaged in an extensive lobbying campaign to authorities in Westmoreland County in an attempt to make it appear that the warrants were somehow authorized considering the failure to any WAHS or HSUS agent to register in Westmoreland County.

101.    Ultimately, the Westmoreland County District Attorney authorized Washington County to pursue charges (which were ultimately abandoned) as to the Westmoreland events, but there existed no *nunc pro tunc* approval of the Westmoreland County search warrants or any statement that the HSUS defendants and WAHS defendants acted lawfully.

102.    WAHS defendants held Plaintiff's property seized from the Westmoreland County location along with property seized from other locations despite Plaintiff repeatedly asking for it to be returned.

103.    The WAHS and HSUS agents continually placed political pressure on and lobbied the Washington County District Attorney's office not to allow a withdrawal of the Westmoreland County charges despite their knowing that they engaged in unlawful conduct.

104.    These actions by WAHS and HSUS prolonged the proceedings and made it nearly impossible to reach an agreement.

105.    As stated above, the criminal charges based on Westmoreland County were withdrawn and the district attorney for Washington County allowed a plea to an extremely minor charges for alleged Washington County conduct.

**The HSUS' Unlawful Criminal Investigation in Washington County**

106.    While WAHS' Glen Thomson maintained registration and authorization in

Washington County to act as a Humane Police Officer, none of the HSUS

defendants did.

107.    As explained above, the HSUS coordinated, assisted, participated in the

drafting of search warrants, and entered the properties conducting a search and

seizing property in Washington County.

108.    The HSUS' actions in Washington County constituted law enforcement

functions reserved for Humane Police Officers, including actually entering the

properties and engaging in searches, but HSUS' agents did not register and

could not perform the functions.

**COUNT I – Constitutional Violations Against WAHS Defendants, HSUS
Defendants, and HAR Defendants as to the Westmoreland County Property.**

109.    The above paragraphs are incorporated by reference and are realleged as if

fully set forth again.

110.    The actions of the HSUS Defendants, WAHS Defendants, and the HAR

defendants in acting as Humane Police Officers under color of law, albeit without

authorization, and engaging in the actions above including conducting an

unlawful criminal investigation, obtaining an illegal search warrant, seizing

property, conducting an illegal search, pursuing unlawful criminal charges, and/or

maliciously prosecuting the Plaintiff constituted violations of the Fourth

Amendment to the United States Constitution.

111.    The actions of the HSUS Defendants and the WAHS Defendants in acting as

law enforcement officers under color of law, without authorization, resulted in a

denial of due process.  Specifically, a search warrant was issued by a judge after

the HSUS and WAHS defendants collectively represented that Thomson was a

statewide Humane Police Officer when he was not.  A search and seizure

occurred in Westmoreland County with law enforcement officers assisting the

HSUS and WAHS.  A private criminal complaint was lodged as to Westmoreland

County conduct, and the unlawful investigation, by the WAHS with the support

and drafting help of the HSUS, and pressure was put on the Washington County

District Attorney's office not to waive the Westmoreland charges resulting in

years of delay, all in violation of Plaintiff's fourteenth amendment due process

rights.

112.    Plaintiff was damaged as a proximate result including suffering severe

emotional distress, having her property seized, losing personal items, having her

privacy invaded, being forced out of the properties she had lawful possession of,

having to endure a prolonged criminal prosecution as to the Westmoreland

County charges,  among other damages.

113.    The HSUS and WAHS defendants acted with willful malice, knowing full well

that they were not entitled to take the actions they did.

114.    The HSUS and WAHS defendants acted intentionally and in gross disregard

of Plaintiff's constitutional rights.

115.    The HSUS and WAHS defendants acted in reckless disregard of the Plaintiff's

Constitutional rights.

116.    To the extent that an HSUS defendant or a WAHS defendant did not actually

enter the house or participate in the constitutional violations, they, along with the

HSUS and WAHS itself, acted with deliberate indifference to the consequences and they maintained a policy, practice, and custom by acting in excess of their law enforcement authority, or in the case of HSUS never having law enforcement authority but coordinating and directing cases, which directly cause the constitutional harm outlined above.

117.    Similarly, each HSUS defendant and WAHS defendant, and the HSUS and WAHS itself, participated in violating the Plaintiff's rights, directed their subordinates to violate them and as the entity or person in charge, or had knowledge of and acquiesced the agents' violations of Plaintiff's constitutional rights.

118.    By allowing media on the property, or filming the search and using the same as a fundraising video, the HSUS defendants and WAHS defendants violated the Plaintiff's Fourth Amendment rights.

119.    By drafting and allowing a search warrant that falsely advises the judge that the WAHS and Thomson are statewide Humane Police Officers when they were, in reality, unregistered Humane Police Officers committing a crime by participating in law enforcement functions in Westmoreland County, the WAHS defendants and the HSUS defendants violated the Plaintiff's Fourth Amendment rights.

WHEREFORE, Plaintiff demands judgment against the WAHS defendants, the HAR defendants, and the HSUS defendants in an amount to be proven at trial, punitive damages, costs of suit, attorney fees if any, and any other relief that may be appropriate and just.

### COUNT II – Intrusion Upon Seclusion as to the WAHS, HAR, and HSUS Defendants as to the Westmoreland County Property

120.    The above paragraphs are incorporated by reference and are realleged as if fully set forth again.

121.    The WAHS, HAR, and HSUS defendants intentionally intruded, physically or otherwise, upon the solitude and seclusion of Plaintiff.

122.    The WAHS defendants, HAR defendants, and HSUS defendants intentionally intruded upon the private affairs of the Plaintiff.

123.    The intrusions were intentional and the WAHS defendants, HSUS defendants, and HAR defendants knew that they were not authorized to act as Humane Police Officers in Westmoreland County and, therefore, they believed, or were substantially certain, that they lacked the necessary legal permission to commit the intrusive act.

124.    The intrusions, by a group of pretend Humane Police Officers, would have been highly offensive to a reasonable person.

WHEREFORE, Plaintiff demands judgment against the WAHS defendants, the HAR defendants, and the HSUS defendants in an amount to be proven at trial, punitive damages, costs of suit, attorney fees if any, and any other relief that may be appropriate and just.

### COUNT III – Trespass against the HSUS, HAR, and WAHS Defendants as to the Westmoreland County Property

125.    The above paragraphs are hereby incorporated by reference and realleged as if fully set forth again.

126.   The WAHS defendants, HAR defendants, and HSUS defendants did two things.  First, they invited the news media and allowed them to enter Plaintiff's property.  Second, they took various videos and used them in connection with fundraising and social media accounts.

127.   The WAHS defendants, HAR defendants, and HSUS defendants authorized or directed the new media and photographers to commit an act which constitutes a trespass.

128.   The WAHS defendants, HSUS defendants, and HAR defendants entering the property constitutes a trespass.

129.   Even if the WAHS defendants were somehow lawfully able to participate in the search, their bringing theHAR defendants and HSUS defendants and the media to the location constituted a trespass as well.

130.   The HSUS defendant, not being an agency with Humane Police Officers at all, had no authority to trespass on the property for any reason.

131.   Similarly, the HSUS defendants and the  WAHS defendants' bringing the HAR defendants to the property constituted a trespass.

132.   The HAR defendants' presence on the property and participation in the search constitutes a trespass.

WHEREFORE, Plaintiff demands judgment against the WAHS defendants, the HAR defendants, and the HSUS defendants in an amount to be proven at trial, punitive damages, costs of suit, attorney fees if any, and any other relief that may be appropriate and just.

## Count IV – 42 USC 1983 Supervisory Liability against WAHS as to the Westmoreland County Property

133.    The above paragraphs are incorporated by reference and are realleged as if fully set forth again.

134.    WAHS is a sponsoring humane society organization that may appoint and sponsor Humane Police Officers.

135.    In doing so, WAHS is equal to a municipal corporation with police officer employees.

136.    WAHS failed to train its Humane Police Officers that they were not statewide Humane Police Officers and had no authority to act in a county where they were not registered amounts to a deliberate indifference to the rights of Plaintiff who their officers came into contact with.

137.    The WAHS' policy of allowing its officers to represent themselves to be statewide Humane Police Officers actually caused the constitutional injuries described in Count I of this Amended Complaint.

138.    The WAHS policy of allowing its officers to obtain warrants without the approval of the District Attorney in Westmoreland County and by concealing or not revealing to the District Attorney and the judge that they had no authorization in Westmoreland County actually caused the constitutional injuries described in Count I of this Amended Complaint.

139.    The Constitutional injuries could have been avoided by more or better training.

140.    The Plaintiff was damaged as a proximate result of the WAHS' policies and procedures and lack of training.

WHEREFORE, Plaintiff demands judgment against the WAHS in an amount to be proven at trial, punitive damages, costs of suit, attorney fees if any, and any other relief that may be appropriate and just.

## COUNT V – Conversion against the WAHS defendants and the HSUS Defendants as to the Westmoreland County Property

141.    The paragraphs above are hereby incorporated by reference and realleged as if fully set forth again.

142.    The WAHS defendants and the HSUS defendants deprived Plaintiff of her right to property and in the possession of her personal items including, but not limited to, the memory chip taken from her video recorder.

143.    In September 2022, the District Attorney for Washington County directed WAHS and HSUS to return all personal property seized.

144.    The WAHS returned some items.

145.    However, the memory chip taken from the video cameras remains unaccounted for.

146.    The WAHS and HSUS defendants' retention of the memory chip is without Plaintiff's consent and without lawful justification.

WHEREFORE, Plaintiff demands judgment against the WAHS defendants and the HSUS defendants in an amount to be proven at trial, punitive damages, costs of suit, attorney fees if any, and any other relief that may be appropriate and just.

## COUNT VI – Constitutional Violations Against the HSUS Defendants, HAR Defendants, and the WAHS Defendants as to the Washington County Property

147.    The above paragraphs are hereby incorporated by reference and are realleged as if fully set forth again

148.   The actions of the HSUS Defendants and HAR Defendants in acting as Humane Police Officers under color of law, albeit without authorization, and engaging in the actions above including conducting an unlawful criminal investigation, entering the Washington County property, conducting a search, and seizing property constituted violations of the Fourth Amendment to the United States Constitution despite their having no authority to participate in law enforcement functions such as seizing evidence.

149.   The WAHS defendants, HSUS defendants, and HAR Defendants invited members of the media into the private property possessed by the Plaintiff.

150.   The WAHS defendants allowed the HSUS defendants and the HAR defendants to make videos for use on social media and as fundraisers and the HSUS and HAR defendants did indeed make videos and display them on social media.

151.   The WAHS defendants invited the HSUS defendants and the HAR defendants onto the premises and into the private property lawfully possessed by the Plaintiff.

152.   The HSUS defendants, WAHS defendants, and HAR defendants acted with willful malice, knowing full well that they were not entitled to take the actions they did.

153.   The HSUS defendants, HAR defendants, and WAHS defendants acted intentionally and in gross disregard of Plaintiff's constitutional rights.

154.   The HSUS defendants, HAR defendants, and WAHS defendants in reckless disregard of the constitutional rights of the Plaintiff.

155.   To the extent that an HSUS defendant or HAR defendant did not actually
enter the house or participate in the constitutional violations, they, along with the
HSUS. HAR, and WAHS itself, acted with deliberate indifference to the
consequences and they maintained a policy, practice, and custom by having one
Humane Police Officer appear on the premises and then allow multiple
non-Humane Police Officers to unlawfully engage in the search and seizure of
evidence, or in the case of HSUS defendants and HAR defendants never having
law enforcement authority but coordinating and directing cases, which directly
caused the constitutional harm outlined above.

156.   All of the HSUS defendants, HAR defendants, and the WAHS defendants
participated in violating the Plaintiff's rights, directed their subordinates to violate
them and as the entity or person in charge, and had knowledge of and
acquiesced the agents' violations of Plaintiff's constitutional rights.

157.   By allowing media on the property, or filming the search and using the same
as a fundraising video, the HSUS defendants, HAR defendants, and WAHS
defendants violated the Plaintiff's Fourth Amendment rights.

WHEREFORE, Plaintiff demands judgment against the WAHS defendants, the
HAR defendants, and the HSUS defendants in an amount to be proven at trial, punitive
damages, costs of suit, attorney fees if any, and any other relief that may be appropriate
and just.

**COUNT VII – Constitutional Violations for Deprivation of Property 42 USC 1983
against HSUS Defendants, WAHS Defendants, and John Does 32-50, and
Conversion against the HSUS Defendants and WAHS Defendants**

158.    The above paragraphs are hereby incorporated by reference and realleged as if fully set forth again.

159.    As to the Washington County property, the WAHS defendants and HSUS defendants arranged for various law enforcement officers who have not yet been identified and are named as John Does 31 to 50 to provide the initial execution of the search warrants.

160.    The WAHS defendants and HSUS defendants along with Does 31 to 50 entered the property and seized various items including guns, weapons, clothing, medical supplies, personal medication, identification, among other things.

161.    In violation of the Pennsylvania Rules of Civil Procedure, neither the WAHS defendants, the HSUS defendants, nor the Does 31 to 50 defendants provided or left an inventory of the search of the Church Building as requested by 234 Pa. Code 209.

162.    Plaintiff repeatedly requested all of the items be returned.

163.    As part of the agreement with the Washington County Pennsylvania District Attorney, all items seized were to be returned.

164.    In late 2022, the WAHS defendants returned some, but not all, items taken.

165.    In late 2022, a police department returned some, but not all, weapons taken.

166.    Some of the items not returned and missing include, but are not limited to, the scope from a mini 14, a pistol, magazine for pistol, 3 or more display knives, pocket knives, 10 gallon fish tank, a large quantity of ammunition, and social security card.

167.   Other items may remain missing, including a box of miscellaneous items, but an inventory and accounting of the items taken needs to be reviewed to verify.

168.   The actions of the WAHS defendants, the HSUS defendants, and John Does 31 to 50, in not providing an inventory of items taken from the Church Building or notifying Plaintiff of the identity of the person taking them, have interfered with her substantive and procedural due process rights in contravention of the Fourteenth Amendment to the United States Constitution.

169.   By taking the property and retaining it, and not providing the necessary information for Plaintiff to have the items returned, the WAHS defendants, the HSUS defendants, and John Does 31 through 50, constitutes a taking without due process in contravention of the Fourteenth Amendment to the United States Constitution.

170.   The seizure of the property described above, and the retention thereof, and the taking other non-relevant items such as work history, a magazine from the 1970s, personal medication, flyers, mail, knives, ammunition, social security card, wallets, a tactical vest, and current utility and other bills, by HSUS defendants, WAHS defendants, and Does 31 through 50, grossly exceeded the scope of the search warrants in contravention of Plaintiff's rights under the Fourth Amendment to the United States Constitution.

171.   The actions of the HSUS defendants, WAHS defendants, and Does 31 through 50, were done knowingly and intentionally, and with a reckless disregard for the procedures required when executing a search warrant, seizing items, and creating an inventory of items taken.

172.    In addition to the Constitutional violations, as to the WAHS defendants and the HSUS defendants, the seizure and retention of the items, which Plaintiff is entitled to lawfully possess or control, interfered with her property rights and ability to control the items, and constitutes conversion.

173.    Plaintiff was damaged as a proximate result.

WHEREFORE, Plaintiff demands that this Court enter a declaratory judgment that the actions of the Defendants violated the United States Constitution and enter an injunction against the Defendants directing them to:  (a) Provide a full inventory of the items seized from the Church location and disclose the present location of all items seized on October 30, 2019, and, if the location is not known, provide the identity of the person who took the items; (b) to return the items.  In addition, Plaintiff demands judgment against the WAHS defendants, the HSUS defendants, and Does 31 through 50 in an amount to be proven at trial, punitive damages, costs of suit, attorney fees if any, and any other relief that may be appropriate and just.

**COUNT VIII – Declaratory and Injunctive Relief Against HSUS**

174.    The above paragraphs are hereby incorporated by reference and are realleged as if fully set forth again.

175.    Plaintiff maintains tentative plans to create a new animal shelter in Westmoreland County, Pennsylvania, beginning in January 2025.

176.    Plaintiff does not wish to be subject to unconstitutional actions by the HSUS.

177.    The HSUS did not register its agents in any county in Pennsylvania as Humane Police Officers.

178.   Nevertheless, the HSUS participates in investigations, authors and edits search warrants, enters properties and assists performing searches, and takes news media onto the property of persons when conducting its law enforcement functions within Pennsylvania.

179.   Without registering, these functions are unlawful and criminal.

180.   Therefore, a justiciable controversy exists whether the actions of the HSUS is in engaging in the functions of Humane Police Officers in the Commonwealth of Pennsylvania without registering each and every officer that takes these actions.

181.   To resolve this controversy, Plaintiff seeks the appropriate declaratory and injunctive relief.

WHEREFORE, Plaintiff respectfully demands that this Court adjudge and declare that the Humane Society of the United States engages in unconstitutional law enforcement functions by acting as Humane Police Officers without having complied with the statutory requirements when it: (1) Participates in the drafting of search warrants; (2) Has its agents enter private property when executing or assisting other animal rights organizations execute a search warrant; (3) Invites news media to enter the private property of persons; and (4) Video records the private property of persons without their authorization and places it on social media in an effort to obtain donations or for other publicity purposes.  In addition, Plaintiff demands that this Court enjoin all such similar conduct.

**Count IX – 42 USC 1983 Constitutional Violations Against Trooper Tiegarden**

182.   The above paragraphs are incorporated by reference and realleged as if fully set forth again.

183.   As explained above, Tiegarden accompanied the WAHS defendants to a
Magisterial District Judge within Westmoreland County in October 2019 to have a
search warrant executed.

184.   Tiegarden knew, or should have known, that the WAHS Humane Police
Officer lied on his application for a search warrant by claiming he was a statewide
Humane Police Officer when, in reality, the Humane Police Officer was only
authorized to act in any law enforcement or investigative function in Washington
County.

185.   Tiegarden knew, or should have known, that the WAHS Humane Police
Officer – even if authorized to act in Westmoreland County – needed the
approval of the Westmoreland County District Attorney to obtain a search
warrant.

186.   Tiegarden sought to assist the WAHS Humane Police Officer avoid the
requirements of the law by scribbling her signature on the search warrant, but
leaving her name off of it.

187.   Tiegarden is not mentioned anywhere in the search warrant, yet she signed it
attesting to the authority of the Washington County Humane Police Officer.

188.   Tiegarden did not vouch for any personal knowledge of the facts in the search
warrant and did not include any allegation that the Humane Police Officer
constituted a reliable informant.

189.   Rather, Tiegarden just arbitrarily signed the search warrant without
knowledge, reason, or justification and only to help the WAHS Humane Police

Officer avoid the requirements that he register in the County and obtain District Attorney Approval on the warrant.

190.   Tigarden had no independent probable cause to scribble her name on the search warrant, had no knowledge of the facts, and did not participate in the investigation other than act on the request of the Humane Police Officer to assist him in obtaining the warrant.

191.   Tiegarden was so far removed from the investigation that she never visited the property, never interviewed any witnesses, and simply signed something that did not pertain to her law enforcement functions other than to attempt to thwart legal procedures.

192.   Tiegarden acted intentionally and wilfully, and she recklessly disregarded the Constitutional rights of the Plaintiff.

193.   By doing so, Tiegarden violated the Plaintiff's rights to be free from unlawful search and seizure and to be subjected to an unlawful investigation by an unauthorized Humane Police Officer.

194.   By doing so, Tiegarden violated the Plaintiff's rights to due process in that the procedural safeguards were bypassed as a result of his actions.

195.   Tiegarden's actions caused severe damage to the Plaintiff including, but not limited to, emotional distress, a loss of property, an intrusion into her privacy, among other things.

WHEREFORE, Plaintiff demands judgment against Trooper Tiegarden in an amount to be proven at trial, punitive damages, costs of suit, attorney fees if any, and any other relief that may be appropriate and just.

**COUNT X – 42 USC 1983 Violations Against Troopers Tiegarden and Samuel Jenesky**

196.   The above paragraphs are hereby incorporated by reference and realleged as if fully set forth again.

197.   On or about October 30, 2019, Trooper Tiegarden appeared in Monessen, Westmoreland County, Pennsylvania, at the Plaintiff's property.

198.   A WAHS Humane Police Officer and the HSUS defendants asked Tiegarden and Jenesky to assist executing the warrant.

199.   Tiegarden and Jenesky should have known that neither the WAHS nor HSUS defendants were authorized to conduct law enforcement activity in Westmoreland County or to execute search warrants.

200.   Tiegarden entered the building and checked it.

201.   Thereafter, Tiegarden allowed the WAHS Humane Police Officer Thomson enter the property and search it along with HSUS agents.

202.   Tiegarden left the scene giving the WAHS defendants and the HSUS defendants complete discretion.

203.   After the WAHS defendants and HSUS defendants were done with their search, they had Jenesky sign the inventory list.

204.   Jenesky executed a return of inventory on the search warrant and allowed WAHS Humane Police Officer to sign as the agent conducting the search.

205.   Jenesky allowed the HSUS and WAHS defendants to bring media into the property.

206.   Jenesky knew, or should have known, that the WAHS Humane Police Officer and the HSUS defendants were not authorized to perform investigations or law

enforcement functions in Westmoreland County and were not authorized to bring media representatives into the private property.

207.   Jenesky neither asked the WAHS defendants or the HSUS defendants to demonstrate their authority or show they were registered in Westmoreland County.

208.   After Jenesky signed the inventory, he did not take control of the items seized.  Rather, he simply gave them to the WAHS defendants and the HSUS defendants without any chain of custody.

209.   Jenesky did not supervise the search in question.

210.   Jenesky either allowed the WAHS defendants and the HSUS defendants to remove the memory chip from Plaintiff's property or he did not supervise the search and did not know what they actually took.

211.   By allowing unauthorized HSUS defendants who are not registered in Pennsylvania and unauthorized WAHS defendants who were not registered in Westmoreland County to perform law enforcement functions, Jenesky and Tiegarden violated the Fourth Amendment rights of the Plaintiff.

212.   Jenesky and Tiegarden's actions were willful or intentional, or in reckless disregard for the Constitutional rights of the Plaintiff.

213.   Jenesky and Tiegarden's actions caused damage to the Plaintiff including a loss of her property, emotional distress, among other things.

WHEREFORE, Plaintiff demands judgment against Trooper Tiegarden and Samuel Jenesky in an amount to be proven at trial, punitive damages, costs of suit, attorney fees if any, and any other relief that may be appropriate and just.

**COUNT XI – Conversion or Trespass to Chattels against the Kelly Proudfit and Estate of Glen Thomson**

214.   The above paragraphs are incorporated by reference and realleged as if fully set forth again.

215.   John Doe 34 seized a telephone owned by Plaintiff.  He then deleted a video of Plaintiff's arrest and the assault on her.

216.   John Doe 34 then gave the telephone to Glen Thomson.

217.   Glen Thomson shared the telephone with Kelly Proudfit.

218.   Together, Kelly Proudfit and Glen Thomson deleted additional photographs and video from the telephone.

219.   The photographs and video on the telephone belonged to Plaintiff.

220.   The WAHS defendants and the HSUS defendants dispossessed the chattel of the Plaintiff.

221.   The condition, quality, or value of the chattel is impaired.

222.   Plaintiff was prevented from using the chattel for a substantial time and the videos and pictures were deliberately deleted.

223.   Harm was caused to the property and Plaintiff had a legally protected interest in it.

**COUNT XII – 42 USC 1983 Conspiracy**

224.   The above paragraphs are incorporated by reference and realleged as if fully set forth again.

225.   As explained above, the WAHS defendants, the HSUS defendants, and the HAR defendants, along with State Police Troopers Tiegarden and Jenesky, acting under color of law, took collective action against the Plaintiff to violate her

Fourth and Fifth Amendment rights to the United States Constitution and to
avoid, or conceal, the unauthorized nature of the HSUS and WAHS investigation.

226.   All of the actions above were done in concert and with the knowledge of each
other, including planning by HSUS' general counsel and legal team.

227.   The HSUS coordinated the conspiracy with the WAHS and the State Police.

228.   Each HSUS defendant, HAR defendant, and WAHS defendant took the
affirmative steps to further the conspiracy as stated above.

229.   Each HSUS and WAHS defendant, and Does 31 through 50, took affirmative
steps to take, without due process, the various personal property of the Plaintiff
and not return it.

230.   In totem, the actions of the defendants collectively taken violated the
Plaintiff's Fourth Amendment and Fourteenth Amendment rights under the United
States Constitution.

231.   The actions and participation in the conspiracy was willful and meant for the
sole purpose of furthering the denial and deprivation of the rights of the
Defendants.

WHEREFORE, Plaintiff demands judgment against the WAHS defendants, the
HAR defendants, the HSUS defendants, and Defendant Samuel Jenesky and Trooper
Tiegarden in an amount to be proven at trial, punitive damages, costs of suit, attorney
fees if any, and any other relief that may be appropriate and just.

**COUNT XIII – Excessive Force 42 USC 1983 as to John Does 31 through 34**

232.   The above paragraphs are incorporated by reference and are realleged as if
fully set forth again.

233.    When executing the Washington County search warrant, John Does 31-50

appeared at the premises and knocked on the door.

234.    Plaintiff answered.

235.    John Does 1 through 50, including members of the Washington County Drug

Task Force, Pennsylvania State Police, were standing outside.

236.    John Does 31, 32, 33, and others, including members of the Washington

County Drug Task Force, waived the warrant in the air.

237.    Plaintiff opened the door slightly and an unknown John Doe defendant

placed a catch pole in the door.  The John Doe defendant refused to provide a

copy of the search warrant to Plaintiff or let her read it.  Because Plaintiff's dog

was barking, John Doe defendant instructed Plaintiff to "do something with that

fucking dog or I'm going to shoot it in the fucking head," referring to a visible dog.

238.    Plaintiff advised that she would put the dog away.

239.    At that time the defendants entered the building notwithstanding the Plaintiff's

cooperation.

240.    The Defendants kicked open the front door while simultaneously trying to

break down the back door, causing damage and destruction.

241.    After barging into the property, John Doe 31 saw Plaintiff holding a telephone,

recording their actions. In retaliation, he shouted to the other officers, "she's got a

gun."  Then he said, "She's got another one."

242.    John Doe 32 ran at Plaintiff, elbowed her in the face, and placed her in a

headlock.  John Doe 32 flipped Plaintiff onto the ground.   John Doe 32 then

dragged her outside while still in a headlock and slammed her onto the ground,

popping several stitches Plaintiff had from a surgery that occurred several weeks
before.

243.    John Doe 33 then joined the assault.  He kneeled on her upper back and
placed her in handcuffs.  At no point did Plaintiff resist.

244.    During the assault, Plaintiffs telephone flew from her hand.

245.    John Doe 34 picked up the telephone, stopped the video Plaintiff was filming,
deleted it, and handed it to Glen Thomson and Kelly Proudfit who went through it
and deleted photographs and video.

246.    John Does 32, 33, 34, and possibly other John Doe Police Officers, hoisted
Plaintiff up to her feet and forcibly walked her to a police car.

247.    Said actions by John Does 32, 33, and 34 constitute excessive force in
violation of the Fourth Amendment to the United States Constitution, the
Fourteenth Amendments to the United States Constitution .

WHEREFORE, Plaintiff demands judgment against John Doe Defendants 31
through 34 in an amount to be proven at trial, punitive damages, costs of suit, attorney
fees if any, and any other relief that may be appropriate and just.

**COUNT XIV – 42 USC 1983 Against Ken Jericho and Steven Toprani**

248.       Before and after the searches, the WAHS and HSUS defendants
contacted Ken Jericho, ordinance officer for Donora, Pennsylvania, and/or
Steven Toprani, Solicitor for Donora, Pennsylvania, and asked them to help make
sure that Plaintiff cannot access her residence and buildings in Donora,
Pennsylvania.

249.   Plaintiff lawfully possessed and occupied the residence and church under an arrangement with her prior partner in effect for the prior twelve years.

250.   Pursuant to the understanding and arrangement, Plaintiff paid the utilities, mortgage, and expenses.  However, during certain times, the listed owner of the property assisted Plaintiff with some payments.

251.   After the search warrants were executed, the WAHS and HSUS defendants left a chicken inside the Washington County buildings.

252.   On or about October 30, 2019, Jericho placed red notices on the property claiming it was "condemned" and that no person could enter.  The notices cited the International Property Maintenance Code, which is a book not a law.  The Notice provided no right to seek review and no right to appeal.  Based on information, the notice did not constitute a formal condemnation and was simply a sign that Jericho made and posted.  In fact, later, Jericho admitted he never went inside the building.

253.   The Notice did not state how to cure any violations that warranted condemnation.

254.   The notices constituted a *per se* eviction of Plaintiff without due process.Jericho told Plaintiff that he condemned the house she possessed and the church.

255.   Subsequently, Plaintiff spoke with Jericho.

256.   Jericho, under color of law, verbally provided Plaintiff with a trespass warning.

257.   Jericho stated that Plaintiff could not obtain her personal belongings from the premises and could not enter.

258.   Under ordinances, condemnation requires a notice and an opportunity to appeal.

259.   On November 7, 2019, Plaintiff met with Jericho.

260.   Jericho stated he would allow Plaintiff limited access to obtain her personal effects if she returned at 8:30 a.m. the next day.

261.   On November 8, 2019, Plaintiff again met with Jericho.

262.   During this meeting he stated that he would allow only 20 minutes in the house to obtain Plaintiff's personal effects but it would not occur that day.

263.   Plaintiff stated she wanted to clean the house and remove all of her property.

264.   Jericho stated she could not enter the house and made demands for a lease recorded with the Recorder of Deeds, and other non-existent documents.

265.   Jericho threatened to have the utilities shut off to the house.

266.   Jericho called Toprani who reiterated the same position, that the house was condemned.

267.   Toprani told Plaintiff that the property was condemned and that she could not retrieve her belongings.

268.   Neither Jericho nor Toprani maintained any authority to prevent the Plaintiff from accessing her property.

269.   Both Jericho and Toprani, acting under color of law as solicitor and ordinance officer, to prevent Plaintiff from entering the property under the guise of a fake or informal condemnation.

270.   On November 9 or 10, 2019, agents of the fire department cut the electrical wires to the house, following through on Jericho's threats.

271.   On November 10, 2019, Plaintiff reported the cut to the electrical company which repaired the cut.

272.   On November 11, 2019, agents of the Police Department advised Plaintiff that she had authority to enter the home to remove property and clean it, but at the direction of Jericho she could not live or sleep there.

273.   Plaintiff subsequently entered and discovered that a chicken left in the building by the WAHS and HSUS was traumatized and could have perished.

274.   On November 19, 2019, while loading a U Haul with property, Jericho arrived and started threatening and yelling at Plaintiff's father.

275.   Jericho called Police Jimmy Bryce on speaker phone and told him, "I'm at the Harr residence and you need to come up and arrest that bitch because she's in the house."

276.   The police advised Jericho that Plaintiff was allowed in the house.

277.   The actions taken by Jericho and Toprani, in performing a verbal condemnation of the house, and without providing due process or a formal appealable notice, while harassing and threatening the Plaintiff and preventing her from accessing the property she had a right to possess, constitutes a violation of the Plaintiff's due process and Fourth Amendment rights under the United States Constitution.

278.   Plaintiff had a property interest in accessing the dwelling, cleaning it, and removing her personal items.  In addition, Plaintiff lawfully possessed the property and had a property interest in being able to maintain quiet enjoyment of the premises without the arbitrary interference by the defendants.

279.   Defendants Jericho and Toprani's verbal and informal condemnation of the premises without notice or an opportunity to be heard violated the relevant standards for a municipality taking such an action such as providing a notice of ordinance violations, a right to cure or appeal, a right to a hearing, or other steps to adjudicate the fitness of the dwelling.

280.   Defendants Jericho and Toprani's actions in creating an informal condemnation and simply denying access to the property through threats and intimidation and cutting utilities without formal process or following established procedures, shocks the conscience.

281.   Defendants Jericho and Toprani's actions exceeded their lawful authority.

282.   Defendants Jericho and Toprani's actions constituted a self-help eviction done for the purpose of appeasing the WAHS and HSUS, not for proper regulatory purposes.

283.   Therefore, Plaintiff was denied both substantive due process and procedural due process by the actions of Jericho and Toprani.

284.   The actions were wilful, knowing, and intentional and done with a reckless disregard for the rights of the Plaintiff.

WHEREFORE, Plaintiff demands judgment against Jericho and Toprani in an amount to be proven at trial, punitive damages, costs of suit, attorney fees if any, and any other relief that may be appropriate and just.

### COUNT XV – International Infliction of Emotional Distress Against WAHS defendants, HAR defendants, and HSUS defendants

285.   The paragraphs above are hereby incorporated by reference and are realleged as if fully set forth again.

286.   On or about October 30, 2019, the Washington Area Humane Society, Humane Society of the United States, and Humane Animal Rescue, Does 1 through 30, Glen Thomson, and Kelly Proudfit did deliberately leave a live chicken on Plaintiffs property.

287.   The WAHS defendants, HAR defendants, and HSUS defendants took steps to prevent Plaintiff from entering the property by placing the pressure on the ordinance officer as described above.

288.   As a result the animal could have perished from being neglected for twelve days.

289.   The WAHS defendants, HAR defendants, and HSUS defendants deliberately took these actions to cause emotional distress on the Plaintiff.

290.   The conduct was outrageous.

291.   Emotional distress did occur.

292.   Plaintiff sought and received treatment for her emotional distress that occurred as a proximate result of the actions of the WAHS, HSUS, and HSUS defendants.

293.   As a result, theWashington Area Humane Society, Humane Society of the United States, and Humane Animal Rescue, Does 1 through 30, Glen Thomson, and Kelly Proudfit intentionally inflicted emotional distress on the plaintiff.

294.   The intentional infliction of emotional distress did cause damage to Plaintiff.

WHEREFORE, Plaintiff demands judgment against the WAHS defendants, the HAR defendants, and the HSUS defendants in an amount to be proven at trial, punitive

damages, costs of suit, attorney fees if any, and any other relief that may be appropriate and just.

**COUNT XVI – 42 USC 1983 Action for Constitutional Violations as to Marvin Davis**

295.   The paragraphs above are hereby incorporated by reference and are realleged as if fully set forth again.

296.   The WAHS and HSUS defendants contacted the Monessen ordinance officer Marvin Davis both before and after the searches and asked for assistance in denying Plaintiff access to the property.

297.   Between a month or two prior to the seach and seizure of the Westmoreland County Property, Plaintiff appeared at City Hall, applied for an occupancy permit, and paid $65 for the inspection.

298.   Monessen provided a list of everything required.

299.   Once all requirements were met, Plaintiff called to make an appointment for inspection.

300.   Upon arrival, Davis came in and stated that Kelly Proudfit of the WAHS called the solicitor and instructed him not to provide Plaintiff an occupancy permit.

301.   When Plaintiff protested, Davis stated, "You need to scrub the tub" and "I don't like the paint color in here."

302.   Davis stated that he could not issue the permit and that Plaintiff could not have any property or furniture in the house.  However, then Davis stated that no bed was set up yet at the location.

303.   Davis stated that some drywall needed repaired and that to do so a building permit might need to be requested.

304.   Plaintiff contacted Davis to reschedule the inspection.  Upon arrival, he again stated that Plaintiff was not allowed to have personal property in the building.

305.   Davis stated that he did not like that the bed was set up on the first floor.

306.   Davis stated that he cannot issue a permit because his boss told him not to.

307.   Davis then called an unknown person and said he was at Plaintiff's house to do the inspection.  Davis did not say anything but listened for several minutes before saying ok and hanging up.

308.   Again, Davis reiterated he would not provide a permit.

309.   When asked why, Davis stated, "I told you why."

310.   Plaintiff advised Davis that animals at the other location needed to be moved to the Monessen location for their safety.

311.   Davis stated that the animals could be moved, and personal property could be at the premises, but that Plaintiff could not sleep at the location.

312.   Davis reiterated that either way he would not issue an occupancy permit.

313.   Davis would not provide any written determination, list of items that needed corrected, or a denial of the occupancy permit.  At no point did David perform a complete inspection.

314.   Thereafter, with the assistance of Davis, the HSUS defendants and WAHS defendants used the fact that animals were housed in an "abandoned building" as a pretext to obtain the Westmoreland County search warrants.

315.    On or about October 30, 2019, the WAHS defendants and the HSUS defendants conducted their raid.

316.    The day after, Davis stopped by when Plaintiff was cleaning and stated, "I know how you feel."  When Plaintiff replied by stating, "No you don't," Davis became irritated and left.

317.    The next day, Davis  arbitrarily issued a notice providing Plaintiff five days to clean off her porch.

318.    Sometime thereafter,, Davis sent a letter to Plaintiff stating that she needed to schedule an inspection.

319.    Subsequently, the municipality terminated Davis' role.

320.    As a result of Davis' refuse to issue an occupancy permit, or to deny the permit and provide specific corrections that needed to be made to obtain the permit, Plaintiff was denied the use of her property in excess of sixty days.

321.    Davis' actions were done solely as a pretext to assist the WAHS defendants and the HSUS defendants, not to properly enforce the regulations.

322.    Davis' denial of the occupancy permit without notice or an opportunity to be heard violated the relevant standards for a municipality taking such an action including a right to cure or appeal, a right to a hearing, or other steps to adjudicate the fitness of the dwelling.

323.    Davis' refusal to  follow established procedures and to provide a decision, or notification of any necessary repairs, shocks the conscience.

324.   Davis' actions in informally refusing to issue the occupancy permit without an appealable decision, or notification of reasons, denied Plaintiff both substantive and procedural due process.

325.   The actions were willful, knowing, and intentional and done with a reckless disregard for the rights of the Plaintiff.

WHEREFORE, Plaintiff demands judgment against Marvin Davis in an amount to be proven at trial, punitive damages, costs of suit, attorney fees if any, and any other relief that may be appropriate and just.

Respectfully submitted,

*/s/ Christie Harr*

_____

Christie Harr