**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CHRISTIE HARR,<br><br>Plaintiff,<br><br>v.<br><br>WASHINGTON AREA HUMANE SOCIETY, MARANDA COOMBS (JOHN DOE 1), BARB LYLE (JOHN DOE 2), CHELSEI FLEEGAL NEHILLA (JOHN DOE 3),TERESA SALAMONE EXECUTRIX OF THE ESTATE OF GLEN L. THOMSON, KELLY PROUDFIT, JOHN DOES 4-10 agents and employees of Washington Area Humane Society, HUMANE WORLD FOR ANIMALS, SHALIMAR OLIVER, LEANA STORMONT, LAURA KOIVULA, JOHN DOES 11-20 agents and employees of the Humane World for Animals, STEVEN TOPRANI, BOROUGH OF DONORA, SAMUEL JENESKY, SARAH N. TEAGARDEN JOHN DOES 32-50 unknown law enforcement officers,<br><br>Defendants. | ) | 2:21cv01560<br><br><br><br><br><br><br><br><br><br>JURY TRIAL DEMANDED |

**VERIFIED THIRD AMENDED COMPLAINT**

Christie Harr ("Harr") for her Verified Third Amended Complaint, states:

1. The plaintiff is Christie Harr, an individual.
2. Defendant Washington Area Humane Society, who caused its agents to be registered in Washington County, but not Westmoreland County, to act as humane police officers pursuant to 22 P.S. 3708 and other statutes.

3. Defendant Kelly Proudfit is an agent and employee of the Washington Area Humane Society, she is sued in her individual capacity.
4. Defendants Maranda Coombs, Barb Lyle, and Chelsei Fleega are agents and/or employees of the Washington Area Humane Society sued in their individual capacity.
5. Defendant Teresa Salamone, is the Executrix of the Estate of Glen L. Thomson, sued as successor in interest to Glen L. Thomson, a humane police officer registered in Washington County, but not Westmoreland County. He was an agent and employee of WAHS. Fact references to the Estate may occur herein for consistency; however, they refer to Glen L. Thomson.
6. Defendants John Does 2 through 10 are agents and employees of the Washington Area Humane Society who have not yet been identified, but could be through discovery.
7. Collectively the WAHS, Kelly Proudfit, Maranda Coombs, Barb Lyle, Chelsea Fleega, Glen Thomson/TERESA SALAMONE Executrix, of the ESTATE OF GLEN L. THOMSON, and Does 4 through 10 are referred herein as the “WAHS Defendants.”
8. Defendant Humane World for Animals is an organization not registered anywhere in Pennsylvania to act as humane police officers pursuant to 22 P.S. 3708 and other statutes, but conducted actions as if they were humane police officers.

9. Defendants Leana Stormont, Laura Koivula and Shalimar Oliver are agents and employees of the Humane World for Animals.
10. Defendants John Does 11 through 20 are agents and employees of the Humane World for Animals who have not yet been identified, but could be identified through discovery.
11. Collectively the HWA, Leana Stormont, Laura Koivula, Shalimar Oliver, and Does 11 through 20 are collectively referred to as the HWA Defendants.
12. Samuel Jenesky is a Pennsylvania State Trooper being sued for damages in his individual capacity and for declaratory and injunctive relief in his official capacity.
13. Sarah N. Teagarden, a member of the Pennsylvania State Police, named in the original Complaint as John Doe 31, is sued in her individual capacity for damages and in her individual and official capacity for declaratory and injunctive relief.
14. Ken Jericho is an ordinance officer for Donora, Pennsylvania. Jericho is being sued for damages in his individual capacity and for declaratory and injunctive relief in his official capacity.
15. Steven Toprani is the Solicitor for Donora, Pennsylvania, sued for damages in his individual capacity and for declaratory and injunctive relief in his official capacity.
16. Defendant Borough of Donora is a municipality located at 605 Meldon Avenue, Donora, Pennsylvania 15033.

17. John Does 32 through 50 are unknown law enforcement officers sued in their individual capacity for damages and in their individual and official capacities for injunctive and declaratory relief.

**Jurisdiction**

18. Jurisdiction is conferred upon this Court pursuant to 28 USC 1331, 1337 and 42 USC 1983. Supplemental jurisdiction over the state claims exists pursuant 28 USC 1367.

**Pennsylvania's Statutory Scheme Allowing for Private Humane Police Officers**

19. Pennsylvania created a statute allowing employees of animal rights organizations to apply for certification and become "humane police officers after just a two week course." Humane Police Officers may only operate in counties where they are certified. 22 P.S. 3708(a).

20. The individual "has no power or authority to exercise the powers… in any other county whose court of common pleas has not issued an appointment." *Id.*

21. For a judge to issue a search warrant for a humane police officer, said warrant must be approved by the district attorney. 22 P.S. 3710.

22. Any rendering of a search warrant, or law enforcement activity, in violation of the statutory scheme constitutes a misdemeanor. 22 P.S. 3709.

23. "Humane Society Police officer agents can only act in the counties where they have been granted police power by the local Court of Common Pleas." *Mohler v.*

*Labor Day Committee, Inc.,* 443 Pa.Super. 651, 658, 663 A.2d 162, 166 (1995), appeal denied, 544 Pa. 611, 674 A.2d 1074 (1996).

24. However, once approved in one county, "[I]ndividuals desiring to be humane society police officers must be decreed as such by the court of common pleas of the county in which the society has its registered office and then must record the decree in all counties in which they will act. *Hulsizer v. Labor Day Committee*, 557 Pa. 467, 476 (Pa. 1999).
25. Not a single defendant in this case followed any of these well-established procedures in Westmoreland County.
26. As to Washington County, only Thomson and Coombs registered.
27. No other person participating in the law enforcement conduct, conducting and coordinating investigations, authoring search warrants, searching for and seizing property, bothered to try to comply with the requirements.
28. This rendered their conduct criminal.

**Westmoreland Criminal Proceedings**

29. Various criminal proceedings against Harr were brought by Private Criminal Complaint filed by Defendant Washington Area Humane Society and Glen L. Thomson before a Magisterial District Court, including literally thousands of charges occurring in Washington and Westmoreland counties.

30. Neither the Washington Area Humane Society nor Glen L. Thomson maintained any authority to conduct any criminal investigation or police type activities in Westmoreland County.
31. None of the charges originating in the Magisterial District Court resulted in any form of adjudication, final appealable judgment, or conviction.
32. The Washington County District Attorney took over the case and in the Court of Common Pleas of Washington County filed an information under two separate docket numbers.
33. At case CP-63-CR-0001186-2020, the District Attorney's Information filed on August 19, 2020, alleged various felony and misdemeanor Class 2 charges.
34. At Case CP-63-CR-0000205-2020, the District Attorney's Information filed on February 19, 2020, alleged various felony and misdemeanor Class 2 charges.
35. The charges were consolidated into allegations that the District Attorney averred occurred in Washington County alone and some charges that the District Attorney alleged occurred in Washington County "and other locations."
36. None of the charges contained in the Information resulted in an adjudication, guilty verdict, or final appealable judgment.
37. Thereafter, the Commonwealth of Pennsylvania and Plaintiff entered into negotiations where Plaintiff asserted her innocence to all of the charges in question.

38. However, Plaintiff advised of a situation that occurred in Washington County that could be interpreted to be a violation of 18 Pa.C.S. § 5532 §§ A1 Neglect of Animals - Sustenance/Water and offered to enter a plea to that separate non-charged situation.
39. This separate situation did not occur or take place in Westmoreland County and the District Attorney understood that.
40. The District Attorney agreed that all of the charges existing against Plaintiff would be dropped via judgment of non-pros.
41. The District Attorney agreed that Plaintiff could enter a no contest plea to two wholly separate charges that occurred in Washington County, Pennsylvania, not Westmoreland County, Pennsylvania.
42. The District Attorney recognized that the factual basis for the new charges had nothing to do with the prior charges and involved the condition of the building due to weather related damage.
43. A written plea offer was created where Plaintiff waived certain rights as to the wholly new charges that would be read out.
44. In addition, Plaintiff and the District Attorney agreed in writing that it would be Washington County-based occurrences.
45. On September 9, 2022, a plea hearing occurred as to the Plaintiff's criminal case.
46. The Commonwealth amended the Informations verbally to *neglect of animals*, 18 Pa.C.S. 5532(a)(1), a third degree misdemeanor in docket number 205-2020.

47. The Commonwealth amended the Information verbally to *neglect of animals*, 18 Pa.C.S. 5532(a)(1) on case 1186-2020.

48. The Commonwealth proffered no factual information as to this plea, did not describe any offense, and provided no background on the alleged conduct that Plaintiff was entering a no contest plea to.

49. When asked if Harr agreed, her counsel made it clear, “This is, Your Honor, the no contest to the Washington County charges, thank you very much.”

50. At this point, a side bar took place off the record because the presiding Judge knew there existed a dispute about the Westmoreland County charges.

51. At this side bar, it was reiterated that Plaintiff was only entering a plea to brand new Washington County charges and the Westmoreland County conduct was abandoned by the Commonwealth.

52. A plea colloquy occurred, but at no time did the Court or any party discuss any factual basis for the plea.

53. Thereafter, Harr made a statement to the Court. She made that she was entering a plea relating to new Washington County conduct only. She stated:

> I’m pleading No Contest or Nolo Contendre to two counts of misdemeanor level 3 animal neglect, regarding the charges in *Washington County*, for the conditions cited at *320 Second Street, Donora, Pennsylvania 15033, Washington County.*
>
> To be clear, I am not admitting guilt of any crime, but rather, if this case went to trial, they could possibly convince a jury that the animals in question were neglected. At no point did I ever harm or intend to harm

> any of the animals in my case. However, due to the damage both to the residence and the rescue by tornado in August of 2016, and the inability to raise the necessary funds for the repairs, the condition of the property was less than favorable. I do want it noted that I was in the middle of moving the animals to a new, safe location, and had 75 percent of them already moved, when the search and seizure occurred. So I was, indeed, doing my very best to remedy this situation.
>
> And I would also just like to note that I was told that all my property would be returned' however, we have yet to receive an itemized statement for the items taken from the church.

54. Based on that statement, the Court accepted the plea to the new charges that contained no factual basis, allowed the non-pros of the prior charges, and the hearing concluded.
55. Clearly, no adjudication occurred as to Westmoreland County conduct or charges stemming from any activity in Westmoreland County.
56. All remaining charges, other than Washington County specific, were withdrawn, do not exist, and were never adjudicated.
57. There was no ability to appeal any determination, pretrial order, or preliminary finding from the Court of Common Pleas as to the jurisdiction of the private animal rights officers who unlawfully operated in Westmoreland County as the charges were not pursued by the Commonwealth and were withdrawn and abandoned.

58. There existed no ability to appeal to seek any clarification of the charges where the Commonwealth did not dispute at any time during the hearing that it withdrew all of the prior charges.

59. There was no final adjudication on the merits of the Westmoreland County events, allegations, or charges.

The Unlawful Westmoreland County Investigation, Search, and Prosecution

60. The Washington Area Humane Society operates a private law enforcement agency where its agents act as Humane Police Officers.

61. Agents of WAHS including Maranda Coombs, Glen Thomson, and Kelly Proudfit all participated in conducting the Westmoreland County investigation and law enforcement functions without being registered or authorized to act as Humane Police Officers in Westmoreland County.

62. The Humane World for Animals, and its agents, despite routinely performing investigations and acting as Humane Police Officers throughout the Commonwealth of Pennsylvania, refuse to register or comply with Pennsylvania's statutory scheme.

63. Plaintiff operated a non-profit animal shelter in Washington County. A tornado caused damage to the shelter. Plaintiff was in the process of moving the shelter to Westmoreland County when agents of the WAHS, a competing shelter, under the guise of desiring to assist Harr, offered to provide help when, in reality, they were conducting a surreptitious investigation.

64. During the course of the discussions with WAHS, including Glen Thomson and Kelly Proudfit, the Westmoreland County location was shown by Harr.

65. Unbeknownst to Harr, Thomson and WAHS had no authority to operate, investigate, or represent themselves to be Humane Police Officers in Westmoreland County.

66. Eventually, WAHS, its agents including Thomson, Coombs, and Proudfit, and the HWA, including Shalimar Oliver, and the various Doe defendants, decided to continue their investigation and law enforcement functions by entering the Westmoreland property and seize the animals in question along with the property belonging to Harr without regard to their having the ability to operate in Westmoreland County.

67. According to HWA' Oliver, she "was contacted" by WAHS, Proudfit, and Thomson towards the end of August 2019.

68. Pursuant to that contact, the "request was made to [HWA] that should this be something that resulted in the execution of a search warrant, if our organization would be able to assist in supporting them with that seizure."

69. According to Oliver, the two search warrants, including the Westmoreland County warrant, involved a plan and confederation by the WAHS defendants and the HWA defendants, "there was immense planning."

70. Based on information, despite having no law enforcement authority in Westmoreland County, Proudfoot, the CEO of WAHS, Thomson, Coombs,HWA's

Oliver, various attorneys within HSA, its Senior Vice President, and Senior Director controlled the creation, authoring, scheduling, presentation, and submission of the warrants.

71. According to Oliver, HWA has “an office of general counsel that is comprised of several attorneys that have to determine, legally, how what we would engage in. And they also assist with the development of the MOUS, which is an agreement, a memorandum of understanding, to identify what the need is from the requesting agency, and what we’re committing to providing to them, and for how long.”

72. The WAHS and the HWA defendants entered into a comprehensive Memorandum of Understanding to jointly participate, confederate, and act in both the Washington County and the Westmoreland County investigations. To date, neither the WAHS nor the HWA have provided the Memorandum of Understanding.

73. Based on information from Coombs, “[WAHS] Executive Director Kelly Proudfit and [HWA] Shalimar Oliver were in direct contact for quite a long time, setting things up for the seizure and investigation.”

74. Based on information from Coombs, “the relationship with HWA was started before the warrant was issued. There were meetings between us and the DA's office, and other representatives, to try to coordinate this large effort.”

75. In October 2019, the WAHS, HWA, HWA’s attorneys, HWA’s John Does 11 through 20, Thomson, Proudfit, Coombs, Oliver, and others consulted and wrote

a search warrant application for Thomson to sign and execute in Westmoreland County.

76. WAHS, HWA, HWA John Does 11 through 20, Thomson, with the knowledge and acquiescence of Proudfit, Coombs, Oliver and others represented, on said warrant application that Thomson was a statewide Humane Police Officer when, in reality, Thomson was not a statewide Humane Police Officer, but only authorized to act as a Humane Police Officer in Washington County.

77. WAHS John Does 4 through 10, HWA, including multiple staff attorneys, Thomson, Proudfit, WAHS' CEO and Executive Director, Coombs, Oliver, John Does 11 through 20, and others knew, recklessly disregarded, or should have known that Thomson had no authorization to act in Westmoreland County and that purporting to be a Humane Police Officer in that county constituted a crime.

78. In addition, WAHS, HWA, Thomson, Proudfit, Coombs, Oliver, John Does 4 through 20, knew, recklessly disregarded, and ignored the requirement that, even if they were authorized to operate in Westmoreland County, they needed to obtain permission from the District Attorney to obtain a warrant.

79. To attempt and evade the prohibition on unregistered animal activists acting as Humane Police Officers, and the need for district attorney approval on the warrant, Thomson, Proudfit, Coombs, Oliver, John Does 4 through 20, and others arranged for State Police Trooper Teagarden to initial the warrant.

80. Teagarden had no knowledge of the facts in the warrant, could not attest to the facts, and made no assertion therein that the WAHS and Thomson were credible witnesses.

81. Moreover, Teagarden knew, or should have known, that neither the WAHS nor Thomson had authority in Westmoreland County and that, even if they did have authority, needed approval of the District Attorney.

82. Teagarden's name was nowhere on the warrant application as affiant except for the scribbled signature.

83. Teagarden was not mentioned in the body of the search warrant.

84. Based on information and belief, Teagarden merely initialed the warrant not because she had independent knowledge of the facts, but because WAHS and/or HWA asked her to for the sole purpose of creating authority when it did not exist.

85. The search warrant was not approved by the Westmoreland County District Attorney and the filing of the warrant and contents thereof by unregistered and illegal Humane Police Officers was withheld from the Westmoreland County District Attorney.

86. Based on the false representations by WAHS defendants, HWA defendants, Thomson, Proudfit, Coombs, Oliver, John Does, Teagarden, and others that WAHS and Thomson maintained authority to operate as Humane Police Officers in Westmoreland County or were statewide Humane Police Officers, a

magisterial district judge approved a search warrant for Plaintiff's location in Westmoreland County.

87. On or about October 30, 2019, Thomson, Proudfit, Coombs, Oliver, John Does 4 through 20, and others solicited various police agencies to back them up and participate in the search, including the initial breach of the door.

88. Despite having no authority to operate as Humane Police Officers in Westmoreland County, agents of WAHS and HWA entered Plaintiff's location.

89. The agents of WAHS and HWA were allowed to enter by State Police Officer Teagarden, who almost immediately left the scene. WAHS' Coombs allowed HSA to control the scene.

90. According to information from Coombs, she "personally, did not go into that property. When the [HWA], they took over the scene, as far as making sure that everything was documented and handled precisely, with their expertise. So I was staged outside, helping with other HWA volunteers, building cages, just kind of observing the situation and that kind of thing. We did have two representatives from the Humane Society, two of our vet techs, that were in the actual house at the Monessen residence, and that was Barb Lyle and Chelsei Fleegal."

91. The WAHS, Coombs, and Thomson, despite having no authority to operate in Westmoreland County, arrested and transported Plaintiff to a district justice based on a cat in the Westmoreland (Monessen) property.

92. Specifically, according to Coombs, “I was at that property for probably about an hour, and then I was called to the Donora property, because they had served a felony warrant for the care of Linus the cat, that was found at the Monessen property. And so me and Officer Glen Thomson met at the Donora property, went down to the Donora police station, and took Christie Harr to the magistrate to be arraigned on those charges.”

93. Coombs and the WAHS left HWA take control of the scene at the Monessen property, including allowing HWA agents to remain inside Plaintiff’s location, search, seize property, and investigate despite none of their agents having any authority to act as Humane Police Officers in Pennsylvania or Westmoreland County.

94. According to HWA’ Oliver, agents of HWA spent, “On site, physically, each location, cleaning and debriefing prior to those, I believe we were there from about 7:00 a.m. to close to 8:00 p.m. at night, so if you consider about 12 to 13 hours physically in both of those locations.” One of the locations was the Westmoreland County location.

95. Based on information, Oliver herself entered the Westmoreland County property.

96. Based on information, HWA’ Koivula entered the property, assisted with the search, and seized items or assisted in the seizing of items from the Westmoreland County property.

97. Oliver explained that prior to the warrant execution, the HWA uses “somebody who’s going to provide the photography and mapping of the buildings and the structures that we’re entering. So that we can get that initial inspection and idea of exactly the magnitude we’re dealing with.”

98. Oliver explained that the HWA allows law enforcement to secure the scene and make the first entrance.

99. Once that occurs, according to Oliver, law enforcement “will report back to the lead agency. In this case, Washington Area Humane Society, identify what they have or have not found, any concerns that they may have had through their initial inspection as well.”

100. After which, according to Oliver, “And from there is when we then took over with them and entered each structure,” including the Westmoreland County structure.

101. HWA’ Oliver went to the property in Westmoreland County, entered it, and took photographs.

102. HWA defendants, WAHS defendants, and HAR defendants took video of their actions, the Plaintiff’s property, invited the news media, and made fundraising videos, including both the Washington County property and the Westmoreland County property.

103. Based on information, the John Doe agents of Humane Animal Rescue were at the scene in Westmoreland County and entered Plaintiff’s location and

assisted with the search despite not being authorized to act as Humane Police Officers in Westmoreland County.

104. The HWA and WAHS agents, including WAHS Thomson and HWA Kaivula, found and seized various medical supplies that had no bearing to the case. These supplies included tubes, syringes, needles, IV lines, gauze, cotton, antibiotics, and antifungal sprays.

105. In addition, HWA and WAHS agents took a memory card near Plaintiff's camera system and retained it.

106. Without verifying that HWA and WAHS had any authority to search for items in the house, and without verifying whether they were registered, State Trooper Jenesky listed the items seized by HWA and WAHS on a search warrant return and inventory.

107. The inventory stated that WAHS' Thomson, who was not registered in Westmoreland County as a Humane Police Officer, conducted the search and that he was "Badge 477" notwithstanding his lack of registration.

108. Jenesky then signed the inventory.

109. Instead of taking possession of the items on the inventory, or securing them as evidence, they were simply gave them to HWA and WAHS to take.

110. As to the memory card, it is unclear whether Thomson and Kaivula informed Jenesky of the seizure and it was omitted from the form, or whether HWA and WAHS' seizure of the memory card was not revealed to Jenesky.

111. Nevertheless, Jenesky, Thomson, and Kaivula signed the search warrant inventory with Jenesky being the affiant, Kaivula being the witness, and Thomson being the "person making search."

112. Jenesky allowed Thomson to sign the inventory as "Badge 477" despite Thomson and the WAHS having no badge number in Westmoreland County and no authority to operate.

113. Thereafter, the WAHS and Thomson initiated criminal proceedings based on the Westmoreland County investigation and seizure.

114. WAHS and Thomson utilized a private criminal complaint to initiate the prosecution as to the Westmoreland County matters.

115. While filed in Washington County, WAHS and Thomson included hundreds of allegations that took place exclusively in Westmoreland County.

116. In 2020, realizing that they committed egregious violations of Pennsylvania law, and had no authorization to act in Westmoreland County, the WAHS defendants and the HWA, through Oliver and various attorneys, engaged in an extensive lobbying campaign to authorities in Westmoreland County in an attempt to make it appear that the warrants were somehow authorized considering the failure to any WAHS or HWA agent to register in Westmoreland County.

117. Ultimately, after pressure, the Westmoreland County District Attorney sent a letter authorizing Washington County to pursue charges (which were ultimately

abandoned) as to the Westmoreland events, but there existed no *nunc pro tunc* approval of the Westmoreland County search warrants or any statement in that letter that it considered the operation of the unregistered Humane Police Officers in that jurisdiction to be lawful.

118. WAHS, including Proudfit and Coombs, held Plaintiff's property seized from the Westmoreland County location along with property seized from other locations despite Plaintiff repeatedly asking for it to be returned.

119. The WAHS, through Proudfit, and HWA, through Oliver and various attorneys, continually placed political pressure on and lobbied the Washington County District Attorney's office not to allow a withdrawal of the Westmoreland County charges despite their knowing that they engaged in unlawful conduct.

120. These actions by WAHS and HWA prolonged the proceedings and made it nearly impossible to reach an agreement.

121. As stated above, the criminal charges based on Westmoreland County were withdrawn and the district attorney for Washington County allowed a plea to an extremely minor charges for alleged separate Washington County conduct not originally charged, having no factual basis, and based on a structural problem.

**<u>The HWA' Unlawful Criminal Investigation in Washington County</u>**

122. While WAHS' Glen Thomson maintained registration and authorization in Washington County to act as a Humane Police Officer, none of the HWA defendants did.

123. As explained above, the HWA, through Oliver, various staff attorneys and executives, Stormfront, and Koivula, coordinated, assisted, participated in the drafting of search warrants, and actually entered the properties conducting a search and seizing property in Westmoreland and Washington County.

124. The HWA actions, including Oliver, Stormfront, Koivula, John Does 11 through 20, in Westmoreland and Washington County constituted law enforcement functions reserved for Humane Police Officers, including actually entering the properties and engaging in searches, but HWA' agents did not register and could not perform the functions.

**COUNT I – Constitutional Violations Against HWA, HWA JOHN DOES 11-20, SHALIMAR OLIVER, LEANA STORMFRONT, LAURA KOIVULA**

125. The above paragraphs are incorporated by reference and are realleged as if fully set forth again.

126. Based on statements, representations, and judicial admissions on February 5, 2021, by Gordon Einhorn, an attorney licensed in Pennsylvania, who is an agent and representative of Humane World for Animals, HWA and, its "manager of animal crimes," Shalimar Oliver were "personally involved in the investigation and seizure of the animals."

127. WAHS' Maranda Coombs testified under oath that, "[WAHS] Executive Director and, I believe, [HWA] Shalimar Oliver were in direct contact for quite a long time, setting things up for the seizure and investigation."

128. Coombs made it clear under oath that, "the relationship with [HWA] was started before the warrant was issued."

129. Coombs testified that the HWA provided financial assistance as to the investigation and seizure.

130. Coombs testified, "Shalimar was on scene [at the Westmoreland County location], I believe at both locations at some point. But [HWA] representatives were split and at both [the Westmoreland and the Washington County] locations."

131. Coombs testified that, "I'm not sure of the exact amount of animals that were found on th[e Westmoreland] property. I do know that Shalimar, a representative of the [HWA] would be better to attest to the number of the animals at those locations."

132. Coombs, explaining her role at Westmoreland County property explained, "So I, personally, did not go into that property. When the [HWA], they took over the scene, as far as making sure that everything was documented and handled precisely, with their expertise," and "So I was staged outside, helping with other HWA volunteers, building cages, just kind of observing the situation and that kind of thing."

133. In response to the question, "Was [HWA]in charge of processing the animals as they were removed?" Coombs replied, "Yes. They were processing the scene,processing the animals, photographing where they were located, the

emergency veterinary care that may be needed for the animals that they were witnessing at the locations."

134. Coombs testified that she also entered the Washington County property, "At that time, I wasn't sure if the [HWA] had already removed the animals or not."

135. Shalimar Oliver testified on February 5, 2021, that she was employed by the HWA as the "manager of animal crimes for the animal rescue team."

136. Oliver testified that, "The animal rescue team assists in a variety of ways. Specifically, we have an animal crimes team that is comprised of several formal law enforcement officers, myself included, and we work alongside local law enforcement agencies, as well as state and federal agencies, to assist them with animal crimes cases. We provide various resources, and that can look like consultation and guidance for these cases, up to physical resources, that could include various forms of funding, to full-scale deployment, *such as the deployment that we're speaking about today* [at the Westmoreland and Washington County locations. . . ], [a]nd we also provide training to law enforcement agencies across the nation."

137. Oliver testified that, "So we receive complaints via various channels: The online complaints; people contacting our tip lines; law enforcement direct outreach to us. So we field approximately 5,000 complaints of cruelty each year, and the levels vary. If they're responding to us with phone calls for contact."

138. Oliver testified, "So the extensive training that I have received as a law enforcement officer in the State of California, undergoing an eight-week classroom academy, and beyond that, also, three to four months of field training, that's required before you're allowed to graduate. [WAHS] annual training that is provided in various fields of animal welfare, I should say. So animal search and rescue for disaster response. Various classes including large-scale animal rescue, equine investigations, various animal-related classes. And another example would be the justice clearinghouse platform that we also use to acquire a refresher training in these matters, as well."

139. Oliver testified, "and the request was made to us [by WAHS] that should this be something that resulted in the execution of a search warrant, if our organization would be able to assist in supporting them with that seizure."

140. Oliver, when asked about preplanning before the search warrant, testified, "Yes, there was immense planning [...] So in having these conversations, and it would include going through multiple layers within our organization and layers of approval, so that it has to go through our team, itself, via our senior director. Then it also has to be taken up through our SVP, or senior vice president, who oversees our animal care, rescue and sanctuary. And then beyond that, we have an office of general counsel that is comprised of several attorneys that have to determine, legally,now, what we would engage in. And they also assist with the development of the MOU, which is an agreement, if you will, a memorandum of

understanding, to identify what the need is from the requesting agency, and what we're committing to providing to them, and for how long. And then the other groups that we're involved in, multiple discussions in the planning, obviously, the personnel from the Washington Area Humane Society, as well as their code enforcement officer. Through the county, the District Attorney, himself, because when we're committing to a case, especially one of this magnitude involving large-scale neglect, we know that there's about a 100 percent recidivism rate. *So we always want to ensure that if we're going to commit such a tremendous amount of our resources, that a Defendant is going to be held accountable*. So there will be criminal charges, despite what that might look like, that there will be charges that are going to be pursued, so there's not only accountability, but then there's also the monitoring and the assistance provided to these people, through counseling, through probation, through ban of ownership, so they're not able to fall right back into this crime again."

141. Oliver, in response to the question, "Were you present on that particular day?" stated, "Yes, I was. Yes. [...] Most of the day, I was located on the [Washington] property, but I did visit the [Westmoreland] property, too."

142. Oliver testified, "So methodically, we begin with our preplanning. We break down from what we can view of the property ahead of time, and try to evaluate our part, to have a master intake team that provides the main evidence collection and documentation for everything on these properties as part of the seizure. And

so the master intake team consists typically of the lead veterinarian, a case lead, safety officer, somebody who's going to provide the photography and mapping of the buildings and the structures that we're entering. So that we can get that initial inspection and idea of exactly the magnitude of what we're dealing with. [...] So I was considered the case lead, and so I was a part of that master intake team to assess and break down how -- what our approach was going to look like, how the rooms are going to be entered, how those animals in those rooms were going to be removed, as well as working with that veterinarian, and in this situation the safety officer, also, to determine for example, with the church structure, which we needed to exercise great caution with, as Officer Coombs mentioned before. So it was a variety of us that had to assess the needs and what that execution was going to look like."

143. Oliver testified that, "Law enforcement, once the scene is clear, and they've secured the scene, and ensured -- they have to enter every room, every building and structure that they're aware of to ensure that there are no other dangers, whether they be human or animal or other. Now, they will report back to the lead agency. In this case, Washington Area Humane Society, identify what they have or have not found, any concerns that they may have had through their initial inspection, as well. ***And from there is when we then took over with them and entered each structure."***

144. Oliver testified and admitted that she entered both the Westmoreland and the Washington County properties, including the rooms, basements, and all floors.

145. Based on information, HWA assisted the WAHS in the preparation of the search warrants, the language of the search warrant, including but not limited to the false statement that the WAHS officer was a "statewide" humane officer, and obtaining the search warrant in Westmoreland County.

146. During the five years prior to this case, and after the search warrant executions, HWA continued to assist in criminal investigations in the United States and Pennsylvania, including locations it is prohibited by law from doing so because of a lack of registration.

147. HWA has a general policy and custom, along with express permission and organizational review by the most senior executives of the organization, including their attorneys, Senior Director, Senior Vice President, Manager of Animal Crimes, and various attorneys, to assist third-parties prepare search warrants, conduct animal investigations, to enter private property, to rummage through personal space and belongings, to make seizures of property, to take over the scene, and to act as law enforcement officers regardless of authority.

148. In this case, the actions of the HWA, its agents, self-described formal law enforcement officers, were all approved by high level management, including Senior Director, Senior Vice President, Manager of Animal Crimes, and various attorneys, resulting in the individuals taking the actions they did.

149. HWA purports to be, represents itself to be, and has a custom to act as a nationwide law enforcement agency, with its employees self-identifying as “formal law enforcement” officers regardless of the state or county they are operating in.

150. HWA, pursuant to its customs, routinely has its agents engage in law enforcement and investigative conduct in Pennsylvania, and have in the past engaged in law enforcement and investigative conduct, in Pennsylvania, despite not registering their employees as humane police officers in the relevant counties,

151. HWA and its agents, pursuant to the policies, customs, and procedures of the HWA, and purporting to be “formal law enforcement” officers, Oliver included, acted under color of state law in taking over the scene at the execution of search warrants, entering dwellings, seizing evidence, and taking the evidence out of state.

152. HWA maintained all authority and decision making in the criminal case, including deciding how and where to allow Harr and her defense counsel to inspect the items they seized as purported law enforcement officers.

153. HWA, pursuant to its customs and procedures, portraying itself as a nationwide law enforcement agency, appeared to obtain permission from agents of the Attorney General of Pennsylvania, the Pennsylvania State Police, Donora and Monessen code enforcement officers, local police, and members of a drug task force to act as formal law enforcement and to participate in the searches,

seizures, investigations, and other law enforcement functions regardless of the legality and notwithstanding that Pennsylvania specifically criminalizes and prohibits the unauthorized law enforcement functions, the actions of the HWA Defendants, WAHS Defendants, and the HAR defendants in acting as Humane Police Officers under color of law, albeit without authorization, and engaging in the actions above including conducting an unlawful criminal investigation, obtaining an illegal search warrant, seizing property, conducting an illegal search, pursuing unlawful criminal charges, and/or maliciously prosecuting the Plaintiff constituted violations of the Fourth Amendment to the United States Constitution.

154. Stormfront, Koivula, and John Does 11-20 also participated in the search, entering the properties, taking items, investigating, and acting as Humane Police Officers.

155. The actions of the HWA, Oliver, Stormfront, Koivula, and John Does 11-20, in acting as law enforcement officers under color of law in contravention of Pennsylvania's statute prohibiting them from doing so, resulted in a denial of due process.

156. Specifically, a search warrant was issued by a judge after the HWA and its agents including Oliver, various attorneys who are agents of the HWA and are within John Does 11-20, and other support staff, caused the WAHS to falsely represent to a Pennsylvania Magisterial District Judge that Thomson was a

statewide Humane Police Officer when he was not and they knew, or should have known, he was not.

157. A search and seizure occurred in Westmoreland County with law enforcement officers assisting the HWA, and HWA went so far as to participate in the search and take over the scene

158. A private criminal complaint was lodged as to Westmoreland County conduct, and the unlawful investigation, by the HWA, with the support and drafting help of the HWA, Oliver, and John Does 11-20.

159. As admitted by Oliver, pressure was put on the Washington County District Attorney's office by HWA, John Does 11-20, and Oliver not to waive the Westmoreland charges resulting in years of delay, all in violation of Plaintiff's fourteenth amendment due process rights.

160. Plaintiff was damaged as a proximate result including suffering severe emotional distress, having her property seized, losing personal items, having her privacy invaded, being forced out of the properties she had lawful possession of, having to endure a prolonged criminal prosecution as to the Westmoreland County charges, among other damages.

161. The HWA, John Does 11-20, Stormfront, Koivula, and Oliver defendants acted with willful malice, knowing full well that they were not entitled to take the actions they did.

162. The HWA, John Does 11-20, Stormfront, Koivula, and Oliver acted intentionally and in gross disregard of Plaintiff's constitutional rights.

163. The HWA, John Does 11-20, Stormfront, Koivula, and Oliver acted in reckless disregard of the Plaintiff's Constitutional rights.

164. To the extent that an HWA John Doe defendant did not actually enter the house or participate in the constitutional violations, they, along with the HWA and itself, acted with deliberate indifference to the consequences and they maintained a policy, practice, and custom by acting in an unauthorized law enforcement authority, but coordinating and directing cases, including participating in the authorship of the search warrant, falsely representing the WAHS officer was a statewide officer, putting pressure on the District Attorney, all of which directly caused or enhanced the constitutional harm outlined above.

165. Similarly, HWA, John Does 11-20, Stormfront, Koivula, and Oliver participated in violating the Plaintiff's rights, directed their subordinates to violate them and as the entity or person in charge, or had knowledge of and acquiesced the agents' violations of Plaintiff's constitutional rights.

166. By allowing media on the property, or filming the search and using the same as a fundraising video, HWA, John Does 11-20, Stormfront, Koivula, and Oliver violated the Plaintiff's Fourth Amendment rights.

167. By drafting and allowing a search warrant that falsely advises the judge that the WAHS and Thomson are statewide Humane Police Officers when they were,

in reality, unregistered Humane Police Officers committing a crime by participating in law enforcement functions in Westmoreland County,HWA, John Does 11-20, Stormfront, Koivula, and Oliver violated the Plaintiff's Fourth Amendment rights.

WHEREFORE, Plaintiff demands judgment against HWA, John Does 11-20, Stormfront, Koivula, and Oliver in an amount to be proven at trial, punitive damages, costs of suit, attorney fees if any, and any other relief that may be appropriate and just.

**COUNT II – Intrusion Upon Seclusion as to the HWA, John Does 11-20, Stormfront, Koivula, and Oliver Defendants as to the Westmoreland County Property**

168. The above paragraphs are incorporated by reference and are realleged as if fully set forth again.

169. HWA, John Does 11-20, Stormfront, Koivula, and Oliver intentionally intruded, physically or otherwise, upon the solitude and seclusion of Plaintiff.

170. The HWA, John Does 11-20, Stormfront, Koivula, and Oliver intentionally intruded upon the private affairs of the Plaintiff.

171. The intrusions were intentional and HWA, John Does 11-20, Stormfront, Koivula, and Oliver knew that they were not authorized to act as Humane Police Officers in Westmoreland County and, therefore, they believed, or were substantially certain, that they lacked the necessary legal permission to commit the intrusive act.

172. The intrusions, by a group of pretend Humane Police Officers, would have been highly offensive to a reasonable person.

WHEREFORE, Plaintiff demands judgment against the HWA, John Does 11-20, Stormfront, Koivula, and Oliver in an amount to be proven at trial, punitive damages, costs of suit, attorney fees if any, and any other relief that may be appropriate and just.

**COUNT III – Trespass against HWA, John Does 11-20, Stormfront, Koivula, and Oliver as to the Westmoreland County Property**

173. The above paragraphs are hereby incorporated by reference and realleged as if fully set forth again.

174. HWA, John Does 11-20, Stormfront, Koivula, and Oliver defendants did several things. First, they entered the locations controlled by Harr without lawful authority. Second, they seized her items and ransacked the entire property. Third, they invited the news media and allowed them to enter Plaintiff's property. Fourth, they took various videos and used them in connection with fundraising and social media accounts.

175. HWA, John Does 11-20, Stormfront, Koivula, and Oliver authorized or directed the news media and photographers to commit an act which constitutes a trespass.

176. HWA, John Does 11-20, Stormfront, Koivula, and Oliver defendants entering the property constitutes a trespass.

177. Even if HWA, John Does 11-20, Stormfront, Koivula, and Oliver were somehow lawfully able to participate in the search, their bringing the media to the location constituted a trespass as well.

178. HWA, John Does 11-20, Stormfront, Koivula, and Oliver not being an agency or being Humane Police Officers at all, had no authority to trespass on the property for any reason.

179. HWA, John Does 11-20, Stormfront, Koivula, and Oliver's presence on the property and participation in the search constitutes a trespass.

WHEREFORE, Plaintiff demands judgment against HWA, John Does 11-20, Stormfront, Koivula, and Oliver in an amount to be proven at trial, punitive damages, costs of suit, attorney fees if any, and any other relief that may be appropriate and just.

**Count IV – 42 USC 1983 Supervisory Liability against HWA as to the Westmoreland County Property**

180. The above paragraphs are incorporated by reference and are realleged as if fully set forth again.

181. The HWA is an organization that holds itself out to be a nationwide law enforcement agency with "formal law enforcement" officers.

182. HWA is equal to a municipal corporation with police officer employees.

183. As explained above, it is the custom and practice of the HWA to participate in searches, execute search warrants, "take of the scene," seize property, and

conduct other unauthorized law enforcement activities in Pennsylvania where it is prohibited by law from doing so.

184. The HWA's actions in this case, and are customarily approved at the highest level including the Senior Director, Senior Vice President, various in house attorneys, and the manager of animal crimes.

185. HWA failed to train its so-called "formal law enforcement" officers that they had no authority to act in a county where they were not registered amounts to a deliberate indifference to the rights of Plaintiff who their officers came into contact with; instead, they, as part of their custom, encourage the participation of their unauthorized officers to gain media attention and donations.

186. The HAW's policy of allowing its officers to act as Humane Police Officers, or to conduct searches, seize evidence, take over the scene, etc., actually caused the constitutional injuries described in Count I of this Amended Complaint.

187. The HWS policy and practice of allowing its agents to write search warrant for other agencies, to assist in obtaining warrants without the approval of the District Attorney in unauthorized counties, and by concealing or not revealing to the District Attorney and the judge that they had no authorization in Westmoreland County actually caused the constitutional injuries described in Count I.

188. The Constitutional injuries could have been avoided by more or better training.

189. The Plaintiff was damaged as a proximate result of the HWA's policies, practices, customs, and procedures.

WHEREFORE, Plaintiff demands judgment against the HWA in an amount to be proven at trial, punitive damages, costs of suit, attorney fees if any, and any other relief that may be appropriate and just.

**COUNT V – Conversion against HWA, John Does 11-20, Stormfront, Koivula, and Oliver Defendants as to the Westmoreland County Property**

190. The paragraphs above are hereby incorporated by reference and realleged as if fully set forth again.

191. HWA, John Does 11-20, Stormfront, Koivula, and Oliver deprived Plaintiff of her right to property and in the possession of her personal items including, but not limited to, 50 boxes of ammunition, memory chips taken from her video recorders, and a fish tank.

192. In September 2022, the District Attorney for Washington County directed HWA, John Does 11-20, Stormfront, Koivula, and Oliver to return all personal property seized.

193. Some items were returned.

194. However, the memory chip, fish tank, ammunition, and other items taken from remain unaccounted for.

195. HWA, John Does 11-20, Stormfront, Koivula, and Oliver defendants' retention of the property is without Plaintiff's consent and without lawful justification.

WHEREFORE, Plaintiff demands judgment against the HWA, John Does 11-20, Stormfront, Koivula, and Oliver in an amount to be proven at trial, punitive damages, costs of suit, attorney fees if any, and any other relief that may be appropriate and just.

**COUNT VI – Constitutional Violations Against HWA, John Does 11-20, Stormfront, Koivula, and Oliver as to the Washington County Property**

196. The above paragraphs are hereby incorporated by reference and are realleged as if fully set forth again

197. The actions of HWA, John Does 11-20, Stormfront, Koivula, and Oliver in acting as Humane Police Officers or performing their functions including searching, investigating, preparing search warrants, taking over the scene, supervising, controlling criminal proceedings, directing the district attorney, directing code enforcement officers, entering the Washington County property, conducting a search, and seizing property constituted violations of the Fourth Amendment to the United States Constitution despite their having no authority to participate in law enforcement functions such as seizing evidence, under color of law.

198. HWA, John Does 11-20, Stormfront, Koivula, and Oliver invited members of the media into the private property possessed by the Plaintiff.

199. HWA, John Does 11-20, Stormfront, Koivula, and Oliver, having taken over the scenes, allowed third-party animal rights organizations to make videos for

use on social media and as fundraisers and the HWA and others did indeed make videos and display them on social media.

200. HWA, John Does 11-20, Stormfront, Koivula, and Oliver, having taken over the scene, invited the other unauthorized civilians onto the premises and into the private property lawfully possessed by the Plaintiff.

201. HWA, John Does 11-20, Stormfront, Koivula, and Oliver acted with willful malice, knowing full well that they were not entitled to take the actions they did.

202. HWA, John Does 11-20, Stormfront, Koivula, and Oliver acted intentionally and in gross disregard of Plaintiff's constitutional rights.

203. HWA, John Does 11-20, Stormfront, Koivula, and Oliver acted in reckless disregard of the constitutional rights of the Plaintiff.

204. All of the above actions are within the aforementioned customs and policies of HWA, which included approvals by their Senior Director, Senior Vice President, manager of animal crimes, and various staff attorneys.

205. HWA, John Does 11-20, Stormfront, Koivula, and Oliver participated in violating the Plaintiff's rights, directed their subordinates to violate them and as the entity or person in charge, and had knowledge of and acquiesced the agents' violations of Plaintiff's constitutional rights.

206. By entering the property, and allowing media on the property, or filming the search and using the same as a fundraising video, HWA, John Does 11-20, Stormfront, Koivula, and Oliver, violated the Plaintiff's Fourth Amendment rights.

WHEREFORE, Plaintiff demands judgment against HWA, John Does 11-20, Stormfront, Koivula, and Oliver in an amount to be proven at trial, punitive damages, costs of suit, attorney fees if any, and any other relief that may be appropriate and just.

**COUNT VII – Constitutional Violations for Deprivation of Property and Exceeding the Scope of the Search Warrant Pursuant to 42 USC 1983 against HWA, John Does 11-20, Stormfront, Koivula, and Oliver**

207. The above paragraphs are hereby incorporated by reference and realleged as if fully set forth again.

208. As to the Washington County and Westmoreland County property, HWA, John Does 11-20, Stormfront, Koivula, and Oliver defendants arranged for various law enforcement officers who have not yet been identified and are named as John Does 31 to 50 to provide the initial execution of the search warrants.

209. HWA, John Does 11-20, Stormfront, Koivula, and Oliver along with Does 31 to 50 entered the properties and seized various items including ammunition, electronics, wallets, discount cards, clothing, medical supplies, personal medication, identification, computers, telephones, an aquarium, among other things.

210. In violation of the Pennsylvania Rules of Civil Procedure, neither the HWA, John Does 11-20, Stormfront, Koivula, and Oliver nor the Does 31 to 50, who took over the scene,provided or left an inventory of the search of the Church Building as required by 234 Pa. Code 209. An inventory was produced (by WAHS) after the fact with respect to the Donora house (but not the Church).

211. Plaintiff repeatedly requested all of the items be returned.

212. As part of the agreement with the Washington County Pennsylvania District Attorney, all items seized were to be returned.

213. In late 2022, some property was returned.

214. In late 2022, a police department returned some, but not all, weapons taken.

215. Some of the items not returned and missing include, but are not limited to, the scope from a mini 14, a pistol, magazine for pistol, 3 or more display knives, pocket knives, 10 gallon fish tank, memory card, and a large quantity of ammunition.

216. Other items may remain missing, including a box of miscellaneous items, but an inventory and accounting of the items taken needs to be reviewed to verify.

217. By taking property and retaining it, and not providing the necessary information for Plaintiff to have the items returned, HWA, John Does 11-20, Stormfront, Koivula, and Oliver, and John Does 31 through 50, constitutes a taking without due process in contravention of the Fourteenth Amendment to the United States Constitution.

218. The seizure of the property described above, and the retention thereof, and the taking other non-relevant items that were not contraband and not related to the investigation such as wallets, discount cards, personal medical records, work history, a magazine from the 1970s, personal medication, flyers, mail, knives, ammunition, social security card, a tactical vest, and current utility and other bills,

by HWA, John Does 11-20, Stormfront, Koivula, and Oliver, who took over the scene, grossly exceeded the scope of the search warrants in contravention of Plaintiff's rights under the Fourth Amendment to the United States Constitution.

219. The actions of the HWA, John Does 11-20, Stormfront, Koivula, and Oliver, who took over the scene, and Does 31 through 50, were done knowingly and intentionally, and with a reckless disregard for the procedures required when executing a search warrant, seizing items, and creating an inventory of items taken.

220. In addition to the Constitutional violations, as to HWA, John Does 11-20, Stormfront, Koivula, and Oliver, who took over the scene, the seizure and retention of the items, which Plaintiff is entitled to lawfully possess or control, interfered with her property rights and ability to control the items, and constitutes conversion.

221. Plaintiff was damaged as a proximate result.

WHEREFORE, Plaintiff demands that this Court enter a declaratory judgment that the actions of the Defendants violated the United States Constitution and enter an injunction against the Defendants directing them to: (a) Provide a full inventory of the items seized from the Church location and disclose the present location of all items seized on October 30, 2019, and, if the location is not known, provide the identity of the person who took the items; (b) to return the items. In addition, Plaintiff demands judgment against the HWA, John Does 11-20, Stormfront, Koivula, and Oliver and Does

31 through 50 in an amount to be proven at trial, punitive damages, costs of suit, attorney fees if any, and any other relief that may be appropriate and just.

**COUNT VIII– Constitutional Violations Against WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Executrix of the Estate of Glen L. Thomson, Kelly Proudfit, and John Does 4-10,as to the Westmoreland County Property.**

222. The above paragraphs are incorporated by reference and are realleged as if fully set forth again.

223. All of the actions alleged in this Complaint were approved by top-level executives of the WAHS, including the Executive Director and CEO. WAHS' custom is to allow its humane police officers to represent themselves as statewide humane police. Practically every executive officer of WAHS participated in the foregoing allegations and WAHS allowed its non-registered non-police officers to participate in the searches, which is their normal practice and procedure as approved by the Executive Director, CEO, and other directors.

224. The actions of WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Glen L. Thomson, Kelly Proudfit, and John Does 4-10 in acting as Humane Police Officers under color of law, albeit without authorization, and engaging in the actions above including conducting an unlawful criminal investigation, obtaining an illegal search warrant, seizing property, conducting an illegal search, pursuing unlawful criminal charges, and/or

maliciously prosecuting the Plaintiff constituted violations of the Fourth Amendment to the United States Constitution.

225. The actions of the WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Glen L. Thomson, Kelly Proudfit, in acting as law enforcement officers under color of law, without authorization, resulted in a denial of due process. Specifically, a search warrant was issued by a judge after the WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Glen L. Thomson, Kelly Proudfit, in addition to the HWA defendants, defendants collectively represented, or caused the representation, that Thomson was a statewide Humane Police Officer when he was not. A search and seizure occurred in Westmoreland County with law enforcement officers assisting WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Glen L. Thomson, Kelly Proudfit. A private criminal complaint was lodged as to Westmoreland County conduct, and the unlawful investigation, by WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Glen L. Thomson, Kelly Proudfit, with the support and drafting help of the HWA, and pressure was put on the Washington County District Attorney's office not to waive the Westmoreland charges resulting in years of delay, all in violation of Plaintiff's fourteenth amendment due process rights.

226. Plaintiff was damaged as a proximate result including suffering severe emotional distress, having her property seized, losing personal items, having her

privacy invaded, being forced out of the properties she had lawful possession of, having to endure a prolonged criminal prosecution as to the Westmoreland County charges, among other damages.

227. WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Glen L. Thomson, Kelly Proudfit, acted with willful malice, knowing full well that they were not entitled to take the actions they did.

228. WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Glen L. Thomson, Kelly Proudfit, defendants acted intentionally and in gross disregard of Plaintiff's constitutional rights.

229. WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Glen L. Thomson, Kelly Proudfit, acted in reckless disregard of the Plaintiff's Constitutional rights.

230. To the extent that WAHS agents, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Glen L. Thomson, Kelly Proudfit, did not actually enter the house or participate in the constitutional violations, they, along acted with deliberate indifference to the consequences and they maintained a policy, practice, and custom by acting in excess of their law enforcement authority, and by allowing HWA to "take over the scene," or in the case of never having law enforcement authority but coordinating and directing cases, which directly cause the constitutional harm outlined above.

231. Similarly, WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Glen L. Thomson, Kelly Proudfit, participated in violating the Plaintiff's rights, directed their subordinates to violate them and as the entity or person in charge, had knowledge of and acquiesced the agents' violations of Plaintiff's constitutional rights, and unlawfully allowed HWA to "take over the scene."

232. By allowing media on the property, or filming the search and using the same as a fundraising video, WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Glen L. Thomson, Kelly Proudfit, violated the Plaintiff's Fourth Amendment rights.

233. By drafting and allowing a search warrant that falsely advises the judge that the WAHS and Thomson are statewide Humane Police Officers when they were, in reality, unregistered Humane Police Officers committing a crime by participating in law enforcement functions in Westmoreland County,WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Glen L. Thomson, Kelly Proudfit, violated the Plaintiff's Fourth Amendment rights.

234. All of the actions were done within the customs and policies of the WAHS, specifically with the knowledge and approval of its Executive Director, CEO, and the other directors.

WHEREFORE, Plaintiff demands judgment against Defendants WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Executrix of the

Estate of Glen L. Thomson, Kelly Proudfit, and John Does 4-10 in an amount to be proven at trial, punitive damages, costs of suit, attorney fees if any, and any other relief that may be appropriate and just.

**COUNT IX – Intrusion Upon Seclusion Against Defendants WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Executrix of the Estate of Glen L. Thomson, Kelly Proudfit, and John Does 4-10 as to the Westmoreland County Property**

235. The above paragraphs are incorporated by reference and are realleged as if fully set forth again.

236. Defendants WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Executrix of the Estate of Glen L. Thomson, Kelly Proudfit, and John Does 4-10 intentionally intruded, physically or otherwise, upon the solitude and seclusion of Plaintiff, or allowed others to intrude, such as appointing HWA to “take over the scene” or allow media inside.

237. Defendants WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Executrix of the Estate of Glen L. Thomson, Kelly Proudfit, and John Does 4-10 intentionally intruded upon the private affairs of the Plaintiff.

238. The intrusions were intentional and Defendants WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Executrix of the Estate of Glen L. Thomson, Kelly Proudfit, and John Does 4-10 knew that they were not authorized to act as Humane Police Officers in Westmoreland County and,

therefore, they believed, or were substantially certain, that they lacked the necessary legal permission to commit the intrusive act.

239. The intrusions, by a group of pretend Humane Police Officers, would have been highly offensive to a reasonable person.

240. All of the actions were done within the customs and policies of the WAHS, specifically with the knowledge and approval of its Executive Director, and the other directors.

WHEREFORE, Plaintiff demands judgment against Defendants WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Executrix of the Estate of Glen L. Thomson, Kelly Proudfit, and John Does 4-10 in an amount to be proven at trial, punitive damages, costs of suit, attorney fees if any, and any other relief that may be appropriate and just.

**COUNT X – Trespass against Defendants WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Executrix of the Estate of Glen L. Thomson, Kelly Proudfit, and John Does 4-10 as to the Westmoreland County Property**

241. The above paragraphs are hereby incorporated by reference and realleged as if fully set forth again.

242. Defendants WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Executrix of the Estate of Glen L. Thomson, Kelly Proudfit, and John Does 4-10 did several things. First, they entered the Westmoreland property with no lawful authority. Second, they allowed the HWA onto the

property and allowed them to "take over the scene." Third, they invited the news media and allowed them to enter Plaintiff's property. Fourth, they took various videos and used them in connection with fundraising and social media accounts. Fifth, they seized and took personal property and effects from Plaintiff.

243. Defendants WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Executrix of the Estate of Glen L. Thomson, Kelly Proudfit, and John Does 4-10 authorized or directed the news media and photographers to commit an act which constitutes a trespass.

244. Defendants WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Executrix of the Estate of Glen L. Thomson, Kelly Proudfit, and John Does 4-10 entering, and allowing others to enter the property and for HWA to take over the scene, constitutes a trespass.

245. Even if the Defendants WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Executrix of the Estate of Glen L. Thomson, Kelly Proudfit, and John Does 4-10 were somehow lawfully able to participate in the search, their bringing HWA onto the property and allowing them to take over the scene, and allowing the media to enter, constitutes a trespass as well.

246. While Maranda Coombs and Glen L Thomson were humane police officers in Washington County only, WAHS' other agents, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, and Kelly Proudfit, had no authority to trespass on the property for any reason or to allow the HWA to enter and take over the scene.

247. Similarly, Defendants WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Executrix of the Estate of Glen L. Thomson, Kelly Proudfit, and John Does 4-10 bringing other organizations and people onto the property constituted a trespass.

248. Defendants WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Executrix of the Estate of Glen L. Thomson, Kelly Proudfit, and John Does 4-10 presence on the property and participation in the search constitutes a trespass.

249. All of the actions were done within the customs and policies of the WAHS, specifically with the knowledge and approval of its Executive Director and CEO, and the other directors.

WHEREFORE, Plaintiff demands judgment against Defendants WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Executrix of the Estate of Glen L. Thomson, Kelly Proudfit, and John Does 4-10 in an amount to be proven at trial, punitive damages, costs of suit, attorney fees if any, and any other relief that may be appropriate and just.

**Count XI – 42 USC 1983 Supervisory Liability against WAHS as to the Westmoreland County Property**

250. The above paragraphs are incorporated by reference and are realleged as if fully set forth again.

251. WAHS is a sponsoring humane society organization that may appoint and sponsor Humane Police Officers.

252. In doing so, WAHS is equal to a municipal corporation with police officer employees.

253. WAHS failed to train its Humane Police Officers that they were not statewide Humane Police Officers and had no authority to act in a county where they were not registered amounts to a deliberate indifference to the rights of Plaintiff who their officers came into contact with.

254. The WAHS' customs and  policy of allowing its officers to represent themselves to be statewide Humane Police Officers actually caused the constitutional injuries described in this this Amended Complaint.

255. The actions alleged in this Complaint were approved by the highest ranking officers of the WAHS, including the Executive Director and CEO, and other directors.

256. The WAHS policy of allowing its officers to obtain warrants without the approval of the District Attorney in Westmoreland County and by concealing or not revealing to the District Attorney and the judge that they had no authorization in Westmoreland County actually caused the constitutional injuries described in Count I of this Amended Complaint.

257. The Constitutional injuries could have been avoided by more or better training.

258. The Plaintiff was damaged as a proximate result of the WAHS' policies and procedures and lack of training.

259. All of the actions were done within the customs and policies of the WAHS, specifically with the knowledge and approval of its Executive Director and CEO, and the other directors.

WHEREFORE, Plaintiff demands judgment against the WAHS in an amount to be proven at trial, punitive damages, costs of suit, attorney fees if any, and any other relief that may be appropriate and just.

**COUNT XII – Conversion against Defendants WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Executrix of the Estate of Glen L. Thomson, Kelly Proudfit, and John Does 4-10.**

260. The paragraphs above are hereby incorporated by reference and realleged as if fully set forth again.

261. Defendants WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Executrix of the Estate of Glen L. Thomson, Kelly Proudfit, and John Does 4-10, deprived Plaintiff of her right to property and in the possession of her personal items including, but not limited to, the memory chip taken from her video recorder, ammunition, an aquarium, personal effects, and other items.

262. In September 2022, the District Attorney for Washington County directed Defendants WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla,

Teresa Salamone, Executrix of the Estate of Glen L. Thomson, Kelly Proudfit, and John Does 4-10 to return all personal property seized.

263. The WAHS returned some items.

264. However, the memory chip taken from the video cameras, ammunition, papers, and aquarium remain unaccounted for.

265. Defendants WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Executrix of the Estate of Glen L. Thomson, Kelly Proudfit, and John Does 4-10 retention of the memory chip is without Plaintiff's consent and without lawful justification.

266. All of the actions were done within the customs and policies of the WAHS, specifically with the knowledge and approval of its Executive Director, and the other directors.

WHEREFORE, Plaintiff demands judgment against Defendants WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Executrix of the Estate of Glen L. Thomson, Kelly Proudfit, and John Does 4-10 in an amount to be proven at trial, punitive damages, costs of suit, attorney fees if any, and any other relief that may be appropriate and just.

**COUNT XIII – Constitutional Violations Against the Defendants WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Executrix of the Estate of Glen L. Thomson, Kelly Proudfit, and John Does 4-10 as to the Washington County Property**

267. The above paragraphs are hereby incorporated by reference and are realleged as if fully set forth again

268. The actions of Defendants WAHS, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Kelly Proudfit, and John Does 4-10 in acting as Humane Police Officers under color of law, albeit without authorization, and engaging in the actions above including conducting an unlawful criminal investigation, entering the Washington County property, conducting a search, and seizing property constituted violations of the Fourth Amendment to the United States Constitution despite their having no authority to participate in law enforcement functions such as seizing evidence.

269. Defendants WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Executrix of the Estate of Glen L. Thomson, Kelly Proudfit, and John Does 4-10 invited members of the media into the private property possessed by the Plaintiff.

270. Defendants WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Executrix of the Estate of Glen L. Thomson, Kelly Proudfit, and John Does 4-10 allowed the HWA defendants and other civilians to make videos for use on social media and as fundraisers and the HWA and others did indeed make videos and display them on social media.

271. Defendants WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Executrix of the Estate of Glen L. Thomson, Kelly Proudfit,

and John Does 4-10 invited the HWA defendants and other unauthorized persons onto the premises and into the private property lawfully possessed by the Plaintiff, including allowing HWA to take over the scene.

272. Defendants WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Executrix of the Estate of Glen L. Thomson, Kelly Proudfit, and John Does 4-10 acted with willful malice, knowing full well that they were not entitled to take the actions they did.

273. Defendants WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Executrix of the Estate of Glen L. Thomson, Kelly Proudfit, and John Does 4-10 acted intentionally and in gross disregard of Plaintiff's constitutional rights.

274. Defendants WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Executrix of the Estate of Glen L. Thomson, Kelly Proudfit, and John Does 4-10 acted in reckless disregard of the constitutional rights of the Plaintiff.

275. To the extent that defendants, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, or Kelly Proudfit, did not actually enter the house or participate in the constitutional violations, they, along with the HWA and WAHS, acted with deliberate indifference to the consequences and they maintained a policy, practice, and custom by having one Humane Police Officer appear on the premises and then allow multiple non-Humane Police Officers to unlawfully

engage in the search and seizure of evidence, which directly caused the constitutional harm outlined above.

276. WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Glen L. Thomson, Kelly Proudfit, participated in violating the Plaintiff's rights, directed their subordinates to violate them and as the entity or person in charge, and had knowledge of and acquiesced the agents' violations of Plaintiff's constitutional rights.

277. By allowing media on the property, or filming the search and using the same as a fundraising video, Defendants WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Glen L. Thomson, Kelly Proudfit violated the Plaintiff's Fourth Amendment rights.

278. All of the actions were done within the customs and policies of the WAHS, specifically with the knowledge and approval of its Executive Director and CEO, and the other directors.

WHEREFORE, Plaintiff demands judgment against Defendants WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Executrix of the Estate of Glen L. Thomson, Kelly Proudfit, and John Does 4-10 in an amount to be proven at trial, punitive damages, costs of suit, attorney fees if any, and any other relief that may be appropriate and just.

**COUNT XIV – Constitutional Violations for Deprivation of Property and Exceeding the Scope of the Search Warrant Pursuant to 42 USC 1983 against Defendants WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Executrix of the Estate of Glen L. Thomson, Kelly Proudfit, John Does**

**4-10, and John Does 32-50, and Conversion against the HWA Defendants and WAHS Defendants**

279. The above paragraphs are hereby incorporated by reference and realleged as if fully set forth again.

280. As to the Washington County property, Defendants WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Executrix of the Estate of Glen L. Thomson, Kelly Proudfit, and John Does 4-10 arranged for various law enforcement officers who have not yet been identified and are named as John Does 31 to 50 to provide the initial execution of the search warrants.

281. Defendants WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Executrix of the Estate of Glen L. Thomson, Kelly Proudfit, and John Does 4-10 along with Does 31 to 50 entered the property and seized various items including luggage, discount cards, backpacks, miscellaneous papers, guns, weapons, clothing, medical supplies, personal medication, identification, video camera memory chips, an aquarium, among other things.

282. In violation of the Pennsylvania Rules of Civil Procedure, neitherDefendants WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Executrix of the Estate of Glen L. Thomson, Kelly Proudfit, and John Does 4-10, the HWA defendants who took over the scene, nor the Does 31 to 50 defendants provided or left an inventory of the search of the Church Building as requested by 234 Pa. Code 209.

283. Plaintiff repeatedly requested all of the items be returned.

284. As part of the agreement with the Washington County Pennsylvania Attorney, all items seized were to be returned.

285. In late 2022, Defendants WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Executrix of the Estate of Glen L. Thomson, Kelly Proudfit, and John Does 4-10 returned some, but not all, items taken.

286. In late 2022, a police department returned some, but not all, weapons taken.

287. Some of the items not returned and missing include, but are not limited to, the scope from a mini 14, a pistol, magazine for pistol, 3 or more display knives, pocket knives, 10 gallon fish tank, and a large quantity of ammunition.

288. Other items may remain missing, including a box of miscellaneous items, but an inventory and accounting of the items taken needs to be reviewed to verify.

289. By taking the property and retaining it, and not providing the necessary information for Plaintiff to have the items returned, Defendants WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Executrix of the Estate of Glen L. Thomson, Kelly Proudfit, and John Does 4-10, and John Does 31 through 50, constitutes a taking without due process in contravention of the Fourteenth Amendment to the United States Constitution.

290. The seizure of the property described above, and the retention thereof, and the taking other non-relevant items such as work history, discount cards suitcases, backpacks, a magazine from the 1970s, personal medication, flyers, mail, knives, ammunition, social security card, wallets, a tactical vest, and current

utility and other bills, electronic, hard drives, computers, by Defendants WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Executrix of the Estate of Glen L. Thomson, Kelly Proudfit, and John Does 4-10, the HWA defendants that WAHS allowed to take over the scene, and Does 31 through 50, grossly exceeded the scope of the search warrants in contravention of Plaintiff's rights under the Fourth Amendment to the United States Constitution. Kelly Proudfit as "CEO" witnessed the search warrant inventory as to the Donora house.

291. The actions of Defendants WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Executrix of the Estate of Glen L. Thomson, Kelly Proudfit, and John Does 4-10 and Does 31 through 50, were done knowingly and intentionally, and with a reckless disregard for the procedures required when executing a search warrant, seizing items, and creating an inventory of items taken.

292. In addition to the Constitutional violations, as to the WAHS defendants and the HWA defendants, the seizure and retention of the items, which Plaintiff is entitled to lawfully possess or control, interfered with her property rights and ability to control the items, and constitutes conversion.

293. Plaintiff was damaged as a proximate result.

WHEREFORE, Plaintiff demands that this Court enter a declaratory judgment that the actions of the Defendants violated the United States Constitution and enter an

injunction against the Defendants directing them to: (a) Provide a full inventory of the items seized from the Church location and disclose the present location of all items seized on October 30, 2019, and, if the location is not known, provide the identity of the person who took the items; (b) to return the items. In addition, Plaintiff demands judgment against Defendants WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Executrix of the Estate of Glen L. Thomson, Kelly Proudfit, and John Does 4-10, and Does 31 through 50 in an amount to be proven at trial, punitive damages, costs of suit, attorney fees if any, and any other relief that may be appropriate and just.

**Count XV – 42 USC 1983 Constitutional Violations Against Teagarden**

294. The above paragraphs are incorporated by reference and realleged as if fully set forth again.

295. As explained above, Teagarden accompanied the WAHS defendants to a Magisterial District Judge within Westmoreland County in October 2019 to have a search warrant signed.

296. Teagarden knew, or should have known, that the WAHS Humane Police Officer lied on his application for a search warrant by claiming he was a statewide Humane Police Officer when, in reality, the Humane Police Officer was only authorized to act in any law enforcement or investigative function in Washington County.

297. Teagarden knew the search warrant was authored, in part, by attorneys for HWA.

298. Teagarden had no first hand knowledge of the alleged facts in the search warrant.

299. Teagarden knew, or should have known, that the WAHS Humane Police Officer – even if authorized to act in Westmoreland County – needed the approval of the Westmoreland County District Attorney to obtain a search warrant.

300. Teagarden sought to assist the WAHS Humane Police Officer avoid the requirements of the law by scribbling her signature on the search warrant, but leaving her name off of it.

301. Teagarden is not mentioned anywhere in the search warrant, yet she signed it attesting to the authority of the Washington County Humane Police Officer.

302. Teagarden did not vouch for any personal knowledge of the facts in the search warrant and did not include any allegation that the Humane Police Officer constituted a reliable informant.

303. Rather, Teagarden just arbitrarily signed the search warrant without knowledge, reason, or justification and only to help the WAHS Humane Police Officer avoid the requirements that he register in the County and obtain District Attorney Approval on the warrant.

304. Teagarden had no independent probable cause to scribble her name on the search warrant, had no knowledge of the facts, and did not participate in the investigation other than act on the request of the Humane Police Officer to assist him in obtaining the warrant.

305. Teagarden was so far removed from the investigation that she never visited the property, never interviewed any witnesses, and simply signed something that did not pertain to her law enforcement functions other than to attempt to thwart legal procedures, specifically aiding and abetting criminal violations of Pennsylvania's animal police officer statutes.

306. Teagarden acted intentionally and wilfully, and she recklessly disregarded the Constitutional rights of the Plaintiff.

307. By doing so, Teagarden violated the Plaintiff's rights to be free from unlawful search and seizure and to be subjected to an unlawful investigation by an unauthorized Humane Police Officer.

308. By doing so, Teagarden violated the Plaintiff's rights to due process in that the procedural safeguards were bypassed as a result of his actions.

309. Teagarden's actions caused severe damage to the Plaintiff including, but not limited to, emotional distress, a loss of property, an intrusion into her privacy, among other things.

310. Teagarden knew that swearing out a false search warrant, or signing a search warrant without first hand knowledge of the fact, constituted constitutional violations.

311. Teagarden did so under color of state law.

WHEREFORE, Plaintiff demands judgment against Trooper Teagarden in an amount to be proven at trial, punitive damages, costs of suit, attorney fees if any, and any other relief that may be appropriate and just.

**COUNT XVI – 42 USC 1983 Violations Against Troopers Teagarden and Samuel Jenesky**

312. The above paragraphs are hereby incorporated by reference and realleged as if fully set forth again.

313. On or about October 30, 2019, Trooper Teagarden appeared in Monessen, Westmoreland County, Pennsylvania, at the Plaintiff's property.

314. A WAHS Humane Police Officer and the HWA agents asked Teagarden and Jenesky to assist in executing the warrant.

315. Teagarden and Jenesky should have known that neither the WAHS nor HWA defendants were authorized to conduct law enforcement activity in Westmoreland County or to execute search warrants.

316. Teagarden entered the building and checked it.

317. Thereafter, Teagarden , knowing that WAHS was not authorized to conduct law enforcement activity in Westmoreland County, allowed the WAHS Humane Police Officer Thomson enter the property and search it along with HWA agents.

318. Teagarden, all while knowing that WAHS and Thomson were not authorized by law to conduct law enforcement activity in Westmoreland County, left the scene giving the WAHS defendants and the HWA defendants complete discretion and control over Harr's property.

319. Teagard allowed HWA to take over the scene and she left the property, leaving unauthorized civilians in control of the entire matter and providing no supervision.

320. Teagarden knew she did not have authority to deputize agents of the WAHS or the HWA to conduct a search in a county where they were not authorized to operate in.

321. After the WAHS defendants and HWA defendants were done with their search, they had Jenesky sign the inventory list.

322. Jenesky executed a return of inventory on the search warrant and allowed WAHS Humane Police Officer to sign as the agent conducting the search, all while knowing that they had no authority to conduct law enforcement activity in Westmoreland County.

323. Jenesky allowed the HWA and WAHS defendants to bring media into the property.

324. Jenesky did not verify the inventory.

325. Jenesky knew, or should have known, that the WAHS Humane Police Officer and the HWA defendants were not authorized to perform investigations or law

enforcement functions in Westmoreland County and were not authorized to bring media representatives into the private property.

326. Jenesky neither asked the WAHS defendants or the HWA defendants to demonstrate their authority or show they were registered in Westmoreland County.

327. After Jenesky signed the inventory, he did not take control of the items seized. Rather, he simply gave them to the WAHS defendants and the HWA defendants without any chain of custody.

328. Jenesky allowed HWA to take over the scene even though they were not authorized in Pennsylvania to conduct law enforcement activity, investigations, searches, seizures, etc.

329. Jenesky did not supervise the search in question.

330. Jenesky either allowed the WAHS defendants and the HWA defendants to remove the memory chip from Plaintiff's property or he did not supervise the search and did not know what they actually took.

331. By allowing unauthorized HWA defendants who are not registered in Pennsylvania and unauthorized WAHS defendants who were not registered in Westmoreland County to perform law enforcement functions, Jenesky and Teagarden violated the Fourth Amendment rights of the Plaintiff.

332. Both Jenesky and Teagarden allowed the HSA and WAHS agents to exceed the scope of the search warrant and seize items not authorized by the Magisterial District Judge.

333. Jenesky and Teagarden's actions were willful or intentional, or in reckless disregard for the Constitutional rights of the Plaintiff.

334. Jenesky and Teagarden's actions caused damage to the Plaintiff including a loss of her property, emotional distress, among other things.

WHEREFORE, Plaintiff demands judgment against Trooper Teagarden and Samuel Jenesky in an amount to be proven at trial, punitive damages, costs of suit, attorney fees if any, and any other relief that may be appropriate and just.

**COUNT XVII – Conversion or Trespass to Chattels against Defendants WAHS, Kelly Proudfit and Teresa Salamone as Executrix of the Estate of Glen Thomson**

335. The above paragraphs are incorporated by reference and realleged as if fully set forth again.

336. John Doe 34 seized a telephone owned by Plaintiff. He then deleted a video of Plaintiff's arrest and the assault on her.

337. John Doe 34 then gave the telephone to Glen Thomson.

338. Glen Thomson shared the telephone with Kelly Proudfit.

339. Together, Kelly Proudfit and Glen Thomson deleted additional photographs and video from the telephone.

340. The photographs and video on the telephone belonged to Plaintiff.

341. Kelly Proudfit, Glen Thomson, and WAHS dispossessed the chattel of the Plaintiff.

342. Kelly Proudfit and Glen Thomson acted at the direction of WAHS and its executive director and directors.

343. The condition, quality, or value of the chattel is impaired.

344. Plaintiff was prevented from using the chattel for a substantial time and the videos and pictures were deliberately deleted.

345. Harm was caused to the property and Plaintiff had a legally protected interest in it.

WHEREFORE, Plaintiff demands judgment against Defendants WAHS, Teresa Salamone, Executrix of the Estate of Glen L. Thomson and Kelly Proudfit in an amount to be proven at trial.

**COUNT XVIII – 42 USC 1983 Conspiracy Against Defendants WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Executrix of the Estate of Glen L. Thomson, Kelly Proudfit, John Does 4-10, HWA, HWA JOHN DOES 11-20, SHALIMAR OLIVER, LEANA STORMFRONT, LAURA KOIVULA, Samuel Jenesky and Trooper Teagarden and John Does 32-50**

346. The above paragraphs are incorporated by reference and realleged as if fully set forth again.

347. As explained above, Defendants along with State Police Troopers Teagarden and Jenesky, acting under color of law, took collective action against the Plaintiff to violate her Fourth and Fifth Amendment rights to the United States

Constitution and to avoid, or conceal, the unauthorized nature of the HWA and WAHS investigation.

348. All of the actions above were done in concert and with the knowledge of each other, including planning by HWA' general counsel and legal team.

349. The HWA coordinated the conspiracy with the WAHS and the State Police.

350. Each HWA defendant, HAR defendant, and WAHS defendant took the affirmative steps to further the conspiracy as stated above.

351. Each HWA and WAHS defendant, and Does 31 through 50, took affirmative steps to take, without due process, the various personal property of the Plaintiff and not return it.

352. In totem, the actions of the defendants collectively taken violated the Plaintiff's Fourth Amendment and Fourteenth Amendment rights under the United States Constitution.

353. The actions and participation in the conspiracy was willful and meant for the sole purpose of furthering the denial and deprivation of the rights of the Defendants.

WHEREFORE, Plaintiff demands judgment against the Defendants WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Executrix of the Estate of Glen L. Thomson, Kelly Proudfit, John Does 4-10, HWA, HWA JOHN DOES 11-20, SHALIMAR OLIVER, LEANA STORMFRONT, LAURA KOIVULA, Samuel Jenesky and Trooper Teagarden and John Does 32-50 in an amount to be proven at

trial, punitive damages, costs of suit, attorney fees if any, and any other relief that may be appropriate and just.

**COUNT XIX – Excessive Force 42 USC 1983 as to John Does 31 through 34**

354. The above paragraphs are incorporated by reference and are realleged as if fully set forth again.

355. When executing the Washington County search warrant, John Does 31-50 appeared at the premises and knocked on the door.

356. Plaintiff answered.

357. John Does 1 through 50, including members of the Washington County Drug Task Force, Pennsylvania State Police, were standing outside.

358. John Does 31, 32, 33, and others, including members of the Washington County Drug Task Force, waived the warrant in the air.

359. Plaintiff opened the door slightly and an unknown John Doe defendant placed a catch pole in the door. The John Doe defendant refused to provide a copy of the search warrant to Plaintiff or let her read it. Because Plaintiff's dog was barking, John Doe defendant instructed Plaintiff to "do something with that fucking dog or I'm going to shoot it in the fucking head," referring to a visible dog.

360. Plaintiff advised that she would put the dog away.

361. At that time the defendants entered the building notwithstanding the Plaintiff's cooperation.

362. The Defendants kicked open the front door while simultaneously trying to break down the back door, causing damage and destruction.

363. After barging into the property, John Doe 31 saw Plaintiff holding a telephone, recording their actions. In retaliation, he shouted to the other officers, “she’s got a gun.” Then he said, “She’s got another one.”

364. John Doe 32 ran at Plaintiff, elbowed her in the face, and placed her in a headlock. John Doe 32 flipped Plaintiff onto the ground. John Doe 32 then dragged her outside while still in a headlock and slammed her onto the ground, popping several stitches Plaintiff had from a recent surgery.

365. John Doe 33 then joined the assault. He kneeled on her upper back and placed her in handcuffs. At no point did Plaintiff resist.

366. During the assault, Plaintiff’s telephone flew from her hand.

367. John Doe 34 picked up the telephone, stopped the video Plaintiff was filming, deleted it, and handed it to Glen Thomson and Kelly Proudfit who went through it and deleted photographs and video.

368. John Does 32, 33, 34, and possibly other John Doe Police Officers, hoisted Plaintiff up to her feet and forcibly walked her to a police car.

369. Plaintiff required medical attention and was diagnosed as having chest wall pain, knee pain, rib sprain, and a cervical sprain.

370. Said actions by John Does 32, 33, and 34 constitute excessive force in violation of the Fourth Amendment to the United States Constitution, the Fourteenth Amendments to the United States Constitution .

WHEREFORE, Plaintiff demands judgment against John Doe Defendants 31 through 34 in an amount to be proven at trial, punitive damages, costs of suit, attorney fees if any, and any other relief that may be appropriate and just.

**COUNT XX – 42 USC 1983 Against Steven Toprani, and Borough of Donora**

371. Before and after the searches, the WAHS and HWA defendants contacted Ken Jericho, ordinance officer for Donora, Pennsylvania, and/or Steven Toprani, Solicitor for Donora, Pennsylvania, and asked them to help make sure that Plaintiff cannot access her residence and buildings in Donora, Pennsylvania.

372. Plaintiff lawfully possessed and occupied the residence and church under an arrangement with her prior partner in effect for the prior twelve years.

373. Pursuant to the understanding and arrangement, Plaintiff paid the utilities, mortgage, and expenses. However, during certain times, the listed owner of the property assisted Plaintiff with some payments.

374. After the search warrants were executed, the WAHS and HWA defendants left a chicken inside the Washington County buildings.

375. On or about October 30, 2019, Jericho placed red notices on the property claiming it was “condemned” and that no person could enter. The notices cited the International Property Maintenance Code, which is a book not a law. The

Notice provided no right to seek review and no right to appeal. Based on information, the notice did not constitute a formal condemnation and was simply a sign that Jericho made and posted. In fact, later, Jericho admitted he never went inside the building.

376. The document found at Entry 80-2 is incorporated by reference. This document was not the notice posted on the property. Based on information, this document was a letter mailed to Gene Jeffries and not provided to the Plaintiff who occupied the dwelling. It is not believed that Mr. Jeffries received the letter.

377. The Notice did not state how to cure any violations that warranted condemnation.

378. The notices constituted a *per se* eviction of Plaintiff without due process.Jericho told Plaintiff that he condemned the house she possessed and the church.

379. The notice on the property did not comply with the International Property Maintenance Code, Section 107(5), that required notification to the occupant as to how to appeal. (In addition, the letter sent to Gene Jeffries similarly failed to comply as it did not contain a notification of the right to appeal).

380. Subsequently, Plaintiff spoke with Jericho.

381. Jericho, under color of law, verbally provided Plaintiff with a trespass warning.

382. Jericho stated that Plaintiff could not obtain her personal belongings from the premises and could not enter.

383. On November 7, 2019, Plaintiff met with Jericho.

384. Jericho stated he would allow Plaintiff limited access to obtain her personal effects if she returned at 8:30 a.m. the next day.

385. On November 8, 2019, Plaintiff again met with Jericho.

386. During this meeting he stated that he would allow only 20 minutes in the house to obtain Plaintiff's personal effects but it would not occur that day.

387. Plaintiff stated she wanted to clean the house and remove all of her property.

388. Jericho stated she could not enter the house and made demands for a lease recorded with the Recorder of Deeds, and other non-existent documents.

389. Jericho threatened to have the utilities shut off to the house.

390. Jericho called Toprani who reiterated the same position, that the house was condemned.

391. Toprani told Plaintiff that the property was condemned and that she could not retrieve her belongings.

392. Neither Jericho nor Toprani maintained any authority to prevent the Plaintiff from accessing her property.

393. Both Jericho and Toprani, acting under color of law as solicitor and ordinance officer, to prevent Plaintiff from entering the property under the guise of a fake or informal condemnation.

394. On November 9 or 10, 2019, agents of the fire department cut the electrical wires to the house, following through on Jericho's threats.

395. On November 10, 2019, Plaintiff reported the cut to the electrical company which repaired the cut.

396. On November 11, 2019, agents of the Police Department advised Plaintiff that she had authority to enter the home to remove property and clean it, but at the direction of Jericho she could not live or sleep there.

397. Plaintiff subsequently entered and discovered that a chicken left in the building by the WAHS and HWA was traumatized and could have perished.

398. On November 19, 2019, while loading a U Haul with property, Jericho arrived and started threatening and yelling at Plaintiff's father.

399. Jericho called Police Jimmy Bryce on speaker phone and told him, "I'm at the Harr residence and you need to come up and arrest that bitch because she's in the house."

400. The police advised Jericho that Plaintiff was allowed in the house.

401. The actions taken by Jericho and Toprani, in performing a verbal condemnation of the house, and without providing due process or a formal appealable notice, while harassing and threatening the Plaintiff and preventing her from accessing the property she had a right to possess, constitutes a violation of the Plaintiff's due process and Fourth Amendment rights under the United States Constitution.

402. Plaintiff had a property interest in accessing the dwelling, cleaning it, and removing her personal items. In addition, Plaintiff lawfully possessed the

property and had a property interest in being able to maintain quiet enjoyment of the premises without the arbitrary interference by the defendants.

403. Defendants Jericho and Toprani's verbal and informal condemnation of the premises without notice or an opportunity to be heard violated the relevant standards for a municipality taking such an action such as providing a notice of ordinance violations, a right to cure or appeal, a right to a hearing, or other steps to adjudicate the fitness of the dwelling.

404. Defendants Jericho and Toprani's actions in creating an informal condemnation and simply denying access to the property through threats and intimidation and cutting utilities without formal process or following established procedures, shocks the conscience.

405. Defendants Jericho and Toprani's actions exceeded their lawful authority.

406. Defendants Jericho and Toprani's actions constituted a self-help eviction done for the purpose of appeasing the WAHS and HWA, not for proper regulatory purposes.

407. To the extent that the so-called condemnation constituted an emergency measure under Section 109 of the IPMC of 2012, Section 109.6 provides that a hearing can be obtained by a petition to the appeals board.

408. However, there exists no appeals board for the Borough of Donora to file a petition for  a hearing.

409. Section 111.1 of the IPMC provides that an appeal can occur. The regulation states, "Application for appeal. Any person directly affected by a decision of the *code official* or a notice or order issued under this code shall have the right to appeal to the board of appeals, provided that a written application for appeal is filed within 20 days after the day the decision, notice or order was served. An application for appeal shall be based on a claim that the true intent of this code or the rules legally adopted thereunder have been incorrectly interpreted, the provisions of this code do not fully apply, or the requirements of this code are adequately satisfied by other means. [A] 111.2 Membership of board. The board of appeals shall consist of a minimum of three members who are qualified by experience and training to pass on matters pertaining to property maintenance and who are not employees of the jurisdiction. The *code official* shall be an ex-officio member but shall have no vote on any matter before the board. The board shall be appointed by the chief appointing authority, and shall serve staggered and overlapping terms. [A] 111.2.1 Alternate members. The chief appointing authority shall appoint a minimum of two alternate members who shall be called by the board chairman to hear appeals during the absence or disqualification of a member. Alternate members shall possess the qualifications required for board membership. [A] 111.2.2 Chairman. The board shall annually select one of its members to serve as chairman. [A] 111.2.3 Disqualification of member. A member shall not hear an appeal in which that member has a

personal, professional or financial interest. [A] 111.2.4 Secretary. The chief administrative officer shall designate a qualified person to serve as secretary to the board. The secretary shall file a detailed record of all proceedings in the office of the chief administrative officer. [A] 111.2.5 Compensation of members. Compensation of members shall be determined by law.

410. Neither Jericho nor Toprani have any board to appeal to. Specifically, there are no members of the appeals board, no secretary, and no chairman.

411. There is no Secretary to file a petition or appeal with, only Jericho and Toprani who act unilaterally without the ability to be reviewed.

412. There is no address for the Board of Appeals to file a petition or appeal with, only Jericho and Toprani.

413. Thus, actions by Jericho and Toprani are not reviewable because they have failed to comply with the provisions within the IPMC to notify persons of their right to appeal, to have an appeals board to file a petition or appeal with, to have independent persons.

414. Moreover, the notice posted and even the letter failed to specify how to resolve the condemnation and, by prohibiting any form of access to the property, deprived Plaintiff of the ability to make the necessary repairs.

415. Rather, the letter – which was not received by Plaintiff – simply stated, that it was an unsafe structure because it is “in disrepair or lacks maintenance, is

insanitary, vermin or rat infested…," all which appear to be issues that could be corrected if access to the property was allowed.

416. Moreover, the letter – which was not received by Plaintiff – identified roof and flooring issues that needed to be addressed, but could not be since Toprani and Jericho would not allow access to the property.

417. It was the policy of the Borough of Donora to fail to establish any appeals procedure for persons affected by the Orders, notifications, and directives of Jericho and Toprani.

418. It was the policy of the Borough of Donora, notwithstanding its adoptions of the IPMC, to fail to comply with Sections 109 and 111.1 thereof by failing to appoint a Board of Appeals, failing to appoint a secretary of said Board, failing to appoint a Chairperson of said board, and taking no action to have members to independently review the actions.

419. Rather, it was the policy of the Borough of Donora to simply have no method to appeal, to ignore the due process requirements of the IPMC, and to have no form of review.

420. It was the policy of the Borough of Donora to have Jericho and Toprani not list any instructions to appeal on any notifications because they did not have an appeals procedure.

421. It was the policy of the Borough of Donora to have no address, person, or location to file a petition or appeal under the IPMC.

422. It was the policy of the Borough of Donora to allow Jericho and Toprani to act without any form of oversight.

423. As a result of the policy of the Borough of Donora, and the actions of Jericho and Toprani, to not establish the appeals board required by the IPMC, having no location to file an appeal, having no independent persons to adjudicate said appeals, the IPMC's could not possibly be complied with, depriving the Plaintiff of due process.

424. Plaintiff remained ready, willing, and able to do the necessary repairs, but because of the policies of the Borough of Donora, and the refusal of Jericho and Toprani to allow the property to be inspected by Plaintiff, they impeded the ability to bring the property back up to code.

425. Therefore, Plaintiff was denied both substantive due process and procedural due process by the actions and policies of the Borough of Donora, Jericho and Toprani.

426. The actions were wilful, knowing, and intentional and done with a reckless disregard for the rights of the Plaintiff.

427. It is outrageous and shocks the conscience for a municipality, its solicitor, and its building inspector to implement a complicated code of rules that include specific appeal and petition requirements, the establishment of a board, and then to simply fail to advise persons of how to file an appeal as required by the IPMC, fail to establish an appeals board leaving residents without any form of redress,

failing to establish an address or place to file a petition or appeal, failing to appoint a secretary of the appeals board, failing to appoint a chairperson of the appeals board, and failing to have any such board whatsoever.

428. It is the custom and policy, decided by the highest levels of executive authority, to not have a pre or post-deprivation due process system.

WHEREFORE, Plaintiff demands judgment against Borough of Donora and Toprani in an amount to be proven at trial, punitive damages, costs of suit, attorney fees if any, and any other relief that may be appropriate and just.

**COUNT XXII – International Infliction of Emotional Distress Against Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Executrix of the Estate of Glen L. Thomson, Kelly Proudfit, John Does 4-10, HWA, HWA JOHN DOES 11-20, SHALIMAR OLIVER, LEANA STORMFRONT, LAURA KOIVULA.**

429. The paragraphs above are hereby incorporated by reference and are realleged as if fully set forth again.

430. On or about October 30, 2019, Defendants WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Executrix of the Estate of Glen L. Thomson, Kelly Proudfit, John Does 4-10, HWA, HWA JOHN DOES 11-20, SHALIMAR OLIVER, LEANA STORMFRONT,and LAURA KOIVULA did deliberately leave a live chicken on Plaintiffs property.

431. Defendants WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Executrix of the Estate of Glen L. Thomson, Kelly Proudfit, John Does 4-10, HWA, HWA JOHN DOES 11-20, SHALIMAR OLIVER, LEANA

STORMFRONT, LAURA KOIVULA took steps to prevent Plaintiff from entering the property by placing the pressure on the ordinance officer as described above.

432. As a result the animal could have perished from being neglected for eleven days.

433. The Defendants WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Executrix of the Estate of Glen L. Thomson, Kelly Proudfit, John Does 4-10, HWA, HWA JOHN DOES 11-20, SHALIMAR OLIVER, LEANA STORMFRONT, LAURA KOIVULA deliberately took these actions to cause emotional distress on the Plaintiff.

434. The conduct was outrageous.

435. Emotional distress did occur.

436. Plaintiff sought and received treatment for her emotional distress that occurred as a proximate result of the actions of the WAHS, HWA, and HWA defendants.

437. As a result, Defendants WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Executrix of the Estate of Glen L. Thomson, Kelly Proudfit, John Does 4-10, HWA, HWA JOHN DOES 11-20, SHALIMAR OLIVER, LEANA STORMFRONT, LAURA KOIVULA intentionally inflicted emotional distress on the plaintiff.

438. The intentional infliction of emotional distress did cause damage to Plaintiff.

WHEREFORE, Plaintiff demands judgment against WAHS, Maranda Coombs, Barbara Lyle, Chelsea Fleegal Hehilla, Teresa Salamone, Executrix of the Estate of Glen L. Thomson, Kelly Proudfit, John Does 4-10, HWA, HWA JOHN DOES 11-20, SHALIMAR OLIVER, LEANA STORMFRONT, LAURA KOIVULA in an amount to be proven at trial, punitive damages, costs of suit, attorney fees if any, and any other relief that may be appropriate and just.

**VERIFICATION**

I, Christie Harr, declare and state under the penalty for perjury that the foregoing is true and correct to the best of my knowledge. 28 USC 1746.

Respectfully submitted,

*/s/ Christie Harr*

Christie Harr